GLOBAL MARINE EXPLORATION, INC.,

      Plaintiff,                         CIVIL ACTION

v.                                    CASE NO. 6:16-CV-1742-ORL-18-KRS

THE UNIDENTIFIED WRECK AND (FOR
FINDERS RIGHT PURPOSES) ABANDONED
SAILING VESSEL, If any, its apparel, tackle,
appurtenances and cargo located within an area
enclosed by a line running from 28.558002° -
80.509884° to 28.520537° - 80.557306° to
28.467799° - 80.469405° and returning to
28.473599° - 80.532415°

      *In rem* Defendant(s).

and REPUBLIC OF FRANCE and STATE OF
FLORIDA,

      Claimants.

---

## CLAIMANT REPUBLIC OF FRANCE
## MOTION TO DISMISS

Pursuant to the Court's orders of April 18, 2017 (Doc. No. 70) and June 21, 2017 (Doc.

No. 74), Claimant Republic of France ("France") hereby moves to dismiss the claims of Plaintiff

Global Marine Exploration, Inc. ("GME") for lack of subject matter jurisdiction pursuant to

Federal Rule of Civil Procedure 12(b)(1).  The Defendant in this *in rem* case is the French Royal

Vessel *la Trinité*, a sunken warship of the Royal Navy of France 1565 Fleet of Jean Ribault.

Accordingly, the *res* has immunity from GME's claims in this Court and may not be subjected to

salvage or other unauthorized disturbance against the wishes of France.

## MEMORANDUM OF LAW

*"We Jan Ribault, Captain in ordinary to the Navy, Chief and leader of the ships and soldiers which the King presently is sending to New France, declare that we have received from the Treasurer and Guard of the Artillery and Munitions of this fleet in Normandy for and every one of the pieces of artillery . . . which are to be carried to New France and employed when it shall be needed in the service of his Majesty."*

(May 26, 1565 French Royal Navy Register of Artillery Issued to Captain Jean Ribault; Lestringant Decl. Ex. 10).

*Beginning on September 10, 1565, "a hurricane and terrible storm came upon them.*

\* \* \*

*On October 15, 1565, "I had notice from the Indians that 70 to 80 French were collected together building a Fort at Cape Canaveral...from the flagship of Juan Rivao, that had been lost there. . ."*

(Pedro Menendez de Aviles Letters of October 15, 1565 and December 5, 1565 to King Philip II of Spain; Delgado Decl. Ex. 7).

From August 28, 1565 to September 10, 1565, French Royal warships commanded by Captain Jean Ribault and Spanish warships commanded by Adelantado Pedro Menendez maneuvered and skirmished from present day St. John's River to present day St. Augustine Inlet in a struggle over whether "la Floride" would be New France or "la Florida" would be "New Spain". At the start, France had the advantage — French Fort Caroline had been built and garrisoned since July 1564 on the St. John's River, while Spain had no on land base or support. The French flagship *la Trinité* and three smaller French warships gave Captain Ribault a numerical advantage in warships against the Spanish and Menendez's largest warship, *San Pelayo*, had been partially dismasted during the voyage from Spain. On September 8, 1565, Menendez "miraculously" escaped a French attack when his ships scraped their way over the shoal at the mouth of St. Augustine Inlet and take shelter in the inlet, where the French warships drew too much water to enter. The French ships remained offshore and exposed to the weather when, beginning on September 10, 1565, "a hurricane and terrible storm came upon them" (Delgado Decl. Ex. 7), a storm "that the Indians assured me . . . was the worst that had ever come to the coast." (Lestringant Decl. Ex. 12). The Ribault warships were driven south by the

northeaster and wrecked. Three of Ribault's warships wrecked somewhere near present day Jupiter and have not been found. Ribault and *la Trinité* were driven further south and wrecked at Cape Canaveral.

Over the next two months, with the French naval threat ended, Menendez stormed Fort Caroline, took it over as Fort San Mateo, and tracked down the castaways from the French fleet. Most of the French survivors were executed at Menendez's orders as Lutheran heretics. France abandoned its territorial ambitions for La Floride and New France, which instead became part of the Viceroyalty of New Spain in the Spanish Empire for more than two and a half centuries, until Florida was ceded to the United States by the Adams-Onis Treaty of 1819.

In this case, as in *Odyssey Marine Exploration Inc. v. The Unidentified Shipwrecked Vessel*, 675 F.Supp. 2d 1126, 1131 (M.D. Fla. 2009); *aff'd*, 675 F.3d 1159 (11th Cir. 2011), "two core questions surface: is the *res* [*la Trinité*] and if so, is [France] entitled to sovereign immunity? In the main, answering the former answers the latter." 675 F.Supp. 2d at 1131.

This motion will show that the allegedly "unidentified" *res* just offshore from Cape Canaveral is *la Trinité,* a French Royal Navy sovereign vessel cloaked with the foreign sovereign immunity of France. Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* As a sunken military craft of a foreign sovereign in United States waters, *la Trinité* is also subject to the statutory prohibition of any award under the laws of finds or salvage provided by the Sunken Military Craft Act, 10 U.S.C. § 113 Note. Accordingly, France is respectfully entitled to a determination that its vessel and associated remains are sovereign immune property of France, the United States courts lack subject matter jurisdiction, and all claims against the *res* must be dismissed.

In support of the motion, France submits four declarations whose exhibits include the French and Spanish records and other evidence which show that the *res* is *la Trinité*. The declarants are: Marie-Laurence Navarri, Magistrate Judge and Attaché for Juridical Affairs of the Embassy of France (Exhibit A); Frank Lestringant, Distinguished Professor of History of the University of Paris - Sorbonne (Exhibit B); Sylvie LeLuc, Head of Artillery of the Musée de l'Armée of the French Ministry of Defense (Exhibit C); and James P. Delgado, Ph.D., a leading Maritime Historian and Nautical Archeologist and recent Head of the National Oceanic and Atmospheric Administration Maritime Heritage Program (Exhibit D).

I.    Procedural History

This *in rem* action was commenced on August 5, 2016 by GME against what GME alleged to be an "unidentified" and "abandoned sailing vessel." (Doc. 1). According to the GME Verified Complaint In Admiralty In Rem, GME is unable to identify the vessel because it "has yet to find any objects in the salvage area that might be used to accurately date and identify the wreckage." (Doc. 1 at p. 3). On examination of the site, the Florida Department of State Bureau of Archeological Research found that GME had damaged an extensive (at least 14 meter by 10 meter) area at the site by indiscriminately blowing a two or more meter deep hole in the sandy seabed. (Doc. 30-2 at p. 14). Far from finding nothing that was datable or identifiable, the hole GME blew into the seabed exposed three bronze cannons that unmistakably bear the Royal insignia of mid-Sixteenth Century France, as does a French stone monument, at the location where the contemporary accounts record that *la Trinité* wrecked in September 1565.

In its post-Complaint motions seeking an arrest of the *res* and appointment as substitute custodian, GME failed to disclose that its Florida Bureau of Archaeological Research permit to operate in Florida waters had been revoked, contrary to its representations to the Court that it was duly operating under Florida state permits. (Docs. 10, 12, 30-3, 30-4). In view of GME's

4

nondisclosures, the Court issued an Order to Show Cause why the arrest should not be vacated (Doc. No 33), but has held it in abeyance in order to give due priority to France's motion challenging subject matter jurisdiction based on the sovereign immunity of its sunken warship. (Doc. 68).

Shortly after the Court issued its April 5 and 18, 2017 procedural orders (Docs. 68 and 70), the Supreme Court reaffirmed that the District Courts must give priority to considering foreign sovereign immunity and that in doing so the District Court may consider and resolve any factual dispute necessary to decide foreign sovereign immunity:

> [W]here jurisdictional questions turn upon further factual development, the trial judge may take evidence and resolve relevant factual disputes. But, consistent with foreign sovereign immunity's basic objective, namely, to free a foreign sovereign from suit, the court should normally resolve those factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible. See *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493-494 (1983).
>
> (*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1316-17 (2017).

GME's professed inability to discern any objects at the site that can "date and identify the wreckage" (Doc. 1 at p. 3), is as disingenuous as its claim that it was operating under a valid permit. The GME "Dig & Identify Report" of June 30, 2016 shows that GME exposed and photographed bronze cannon of the mid-Sixteenth Century decorated with the French *fleur-de-lis*, the distinctive interlocking shield of King Henri II of France (r. 1547-1559) and other Royal markings and insignia datable specifically to mid-Sixteenth Century France. (Delgado Decl. Ex. 2; GME Report at pp. 6-11, 30-40; LeLuc Decl. at ¶¶ 13-17, Appendices 3-5). The GME report also discloses that it exposed and photographed a stone marker bearing French the Royal coat of

arms, an extraordinarily significant and unique monument known to have been intended to mark France's territorial claims to la Floride. (*Id.* at 10, 12, 35; LeLuc Decl. ¶¶ 18-21).

France brings this motion to confirm what GME's own photographs show definitively in themselves: the *res* is the remains of a French warship of the lost Ribault Fleet of 1565, and specifically Ribault's flagship *la Trinité*, wrecked at Cape Canaveral on September 10-12, 1565, when the "hurricane and terrible storm came upon them."

II.    The Procedural And Evidentiary Framework For This Motion

As with many of the issues presented by this case, the procedural framework and standard of proof applicable to a Rule 12(b)(I) motion to dismiss *in rem* claims against a sovereign vessel have been defined in this Court and the Eleventh Circuit Court of Appeals by way of *Odyssey Marine Exploration, Inc. v. The Unidentified Shipwrecked Vessel*, (675 F.Supp. 2d 1126 (M.D. Fla. 2009); *aff'd*, 675 F.3d 1159 (11th Cir. 2011).

The District Court and Court of Appeals decisions in *Odyssey Marine Exploration* provide clear guidance on both the procedural and evidentiary framework that apply to this motion. First, as the Eleventh Circuit affirmed in *Odyssey Marine Exploration*, "when a party raises a factual attack to subject matter jurisdiction . . . the district court is not obligated to take the allegations in the complaint as true. The District Court may "'consider extrinsic evidence such as deposition testimony and affidavits'" [and] "may independently weigh the facts and is not constrained to view them in the light most favorable to the non-movant." (657 F.3d at 1169). No "presumption of truthfulness attaches to [GME's] allegations." (675 F.Supp. 2d at 1131).

Second, "the applicable standard of proof [is] preponderance of the evidence." (675 F. Supp. 2d at 1134). France "bears the burden of proving by a *preponderance* of the evidence" that sovereign immunity applies to the *res*. (675 F. Supp. 2d at 1131, emphasis added). *See also*

*Odyssey Marine Exploration*, 657 F.3d at 1175 (applying "preponderance of the evidence" standard).

    <u>Third</u>, upon a showing (by a preponderance of the evidence) that the *res* is property of a foreign sovereign, the *res* is "presumptively immune from the jurisdiction of United States courts, unless a specified exception [to the Foreign Sovereign Immunities Act] applies, a federal court lacks subject matter jurisdiction." *Odyssey Marine Exploration*, 675 F. Supp. 2d at 1138, quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  If GME were able to make a *prima facie* case that an exception to foreign sovereign immunity applies, then France may rebut by "a preponderance of the evidence that the exception does not apply." (*Id.* at 1138).

    Defining the burden of proof for this motion matters little for this motion, however, because there can be no doubt under any evidentiary standard that the *res* is sovereign property of France.

III.    <u>The Identity of the *Res*</u>

    In *Odyssey Marine Exploration*, identifying the *res* effectively decided the case. (657 F. Supp. 2d at 1131).  In this case, the *res* can only be *la Trinité* and the consequence is equally dispositive.

    A.    <u>The Loss of the Ribault Fleet</u>

    The wrecksite of *la Trinité* marks a pivotal event in French, Spanish and American history: the destruction of France's ambition to occupy la Floride, make it New France, and preempt the Spanish Colonial empire from expanding into what is now the continental United States.  The fate of France's ambitions was sealed when *la Trinité* wrecked at Cape Canaveral on September 10-12, 1565.

    After failed efforts to colonize present day Canada and Brazil, King Charles IX of France gained a toehold in the present day United States ahead of Spain in 1562 by sending Jean Ribault

with two ships and depositing 30 settlers to found Charlesfort in present day Georgia.

(Lestringant Decl., ¶¶ 8-9, 17-22). After Charlesfort was abandoned by all but one of its starving

occupants in 1563, Charles IX sent a larger force in 1564 commanded by Captain René de

Laudannière that settled on a site upriver of the mouth of the "River of May" (now the St. John's

River) on which to build Fort Caroline as the capital of New France. (*Id*. at ¶¶ 22-24)  A year

later, Royal French Navy Captain Jean Ribault, after being released from 1563-1564 British

imprisonment at the Tower of London, was appointed to command a fleet of seven French Royal

Navy and supply ships being outfitted at Dieppe and Le Havre, France to sail to Fort Caroline,

reinforce the garrison with 500 or more soldiers, resupply Fort Caroline's existing occupants and

add to their numbers with 100 or more new skilled tradesmen and settlers.  Captain Jean Ribault,

a Captain in ordinary of the Royal Navy was appointed by King Charles IX to be Captain of *la*

*Trinité*, the flagship of the fleet, and "Chief and Lieutenant of the vessels and military forces that

His Majesty is sending to New France." (*Id*. at ¶¶ 26-39).

The original Registers of the "Treasurer and General Guard of the Artillery and

Munitions of the fleet in Normandy" survive to this day in the National Library of France and

document Captain Ribault's appointment as military commander of the fleet and the soldiers to

be landed at New France.  They also record in meticulous detail "all and every piece of artillery

of bronze and iron, powder, shot and all sorts of equipment and munitions . . . to be transported

to the said place to be placed and employed as the need may arise in the service of His Majesty."

(Lestringant Decl. at ¶¶ 27-34; Lestringant Decl. Ex. 10).

Duly countersigned by Captain Ribault, his commanding officer Grand Admiral Coligny

and the Navy Treasurer and General Guard of the fleet in Normandy, the Registers document

that the Ribault Fleet was a military mission in Royal service and *la Trinité* and its contents are Royal property. (*Id.*).

The Ribault Fleet sailed from Dieppe in May 1565 in an era in which France was wracked by religious tension and outbreaks of outright warfare between the Catholic majority and a rapidly growing Huguenot minority, the latter of which included Grand Admiral Coligny and Captain Ribault. The 600 or more sailors, soldiers and others who sailed on the Ribault Fleet were mostly all Huguenots, but the historical record is clear that Ribault was in command of a Royal mission at Royal expense, to reinforce New France "in the service of His Majesty," not a breakaway Huguenot venture. (Lestringant Decl. at ¶¶ 11-13, 20, 25).

The Ribault Fleet made landfall near the River of May on August 28, 1565 - coincidentally, the same day that Adelantado (Commander and Governor) Pedro Menendez made landfall near present day St. Augustine with a Spanish fleet commissioned by King Philip II to oust the French and bring la Florida within the Spanish Empire. For the next two weeks, the fleets maneuvered back and forth from the St. Augustine Inlet to the St. John's River and back again in inconclusive feints and skirmishes. (Lestringant Decl. at ¶¶ 36-38; Delgado Decl. at ¶¶ 31-34).

The denouement for France began on September 8-10, 1565, after Menendez sent his two largest ships away and became able to get his remaining, smaller ships across the sandbar at St. Augustine Inlet "miraculously at this low tide," such that Ribault's deeper drawing warships could not reach them. Sheltered from the French, Menendez founded St. Augustine and took possession, in the name of Your Majesty [King Philip II] . . . of this land and coast" (Delgado Decl. at ¶ 7), while Ribault and his warships remained offshore. But then, on September 10, 1565, as Captain René de Laudonnière (who was at Fort Caroline in command of

9

the French garrison, escaped capture by the Spanish when they stormed Fort Caroline and made his way back to France on a French ship that escaped the Spanish attack) reported, "such a great storm came up, with such heavy winds, that the Indians assured me that it was the worst that had ever come to the coast." (Delgado Decl. at ¶¶ 34-36; Lestringant Decl., at ¶¶ 38-39).

Realizing that the Ribault Fleet would not be able to get back to Fort Caroline for many days, if ever, Menendez marched his soldiers to Fort Caroline and easily captured it on September 21, 1565. Fort Caroline became Spanish Fort San Mateo. (Delgado Decl. at ¶¶ 37-39).

On September 28, 1565, Menendez learned of "Frenchmen . . . who had lost their ships and escaped by swimming" and had made their way to present-day Matanzas ("Massacre") Inlet. Menendez and 40 Spanish soldiers intercepted them at Matanzas Inlet and learned that they were survivors of three of the Ribault ships, and that *la Trinité* was dismasted in shoals further to the south. The French survivors surrendered, whereupon all of the Huguenots were executed as heretics.   (Delgado Decl. at ¶¶ 40-43).

On October 12, 1565, Menendez intercepted a second group of French castaways at Matanzas Inlet, including Jean Ribault, who were also seeking to make their way north to Fort Caroline, unaware that it had fallen to the Spanish. Menendez again executed the Huguenots who surrendered, including Ribault. (*Id*. at ¶¶ 44-47).

On October 15, 1565, Menendez learned of a third group of survivors. This last group had remained at Cape Canaveral from "the flagship of Jean Ribao that was there lost," and were "making a Fort at Cape Canaveral and a vessel to send to France to ask for aid . . .". On November 1, 1565, Menendez reached Cape Canaveral, where he persuaded the French castaways to surrender with a pledge that they would not be harmed, which he honored, and

10

destroyed the makeshift fort. The prisoners from Cape Canaveral were taken to Havana with Menendez and his soldiers. (*Id*. at ¶¶ 48-50).

The news reached France beginning in January 1656 that Fort Caroline had fallen, the Ribault Fleet was lost and the Fort Caroline garrison as well as most of the castaways had been executed. The final French mission to la Florida was a reprisal raid in 1568 that destroyed Fort San Mateo, recaptured the French cannon there and executed Spanish prisoners taken at the fort in reprisal, then sailed for France. Nothing further was done thereafter to revive the failed French territorial objectives for la Florida. (Lestringant Decl. at ¶¶ 40-43).

For purposes of this motion, as discussed further below, the critical facts from these events are that the Ribault Fleet was a military mission of the then-Kingdom of France to present day Florida and *la Trinité* is a sunken warship of France that wrecked at Cape Canaveral, precisely where GME's Complaint alleges that an unidentifiable wrecked and abandoned sailing vessel that contains artifacts "believed by the Plaintiff to be from the 1550 to 1650 time period" is located. (Doc. 1, p. 3).

B.    Identification of the *Res* as *la Trinité*

The location of the *res*, combined with GME's photographs of the bronze cannon and the stone monument at the site, complete the proof that the *res* at Cape Canaveral is *la Trinité*.

The coordinates of the site as set forth in the GME complaint (Doc. 1) and the maps of finds included in the GME "Dig & Identify Report" (Delgado Decl. Ex. 2 at ¶¶ 19-23-26) establish that the location corresponds to where *la Trinité* was reported to have wrecked by the French castaways. That Cape Canaveral is the wrecksite is stated explicitly also in the October 15, 1565 Menendez letter that the survivors of the wreck of the French flagship were at Cape Canaveral and "the flagship of Juan Rivao . . . had been lost there." (Delgado Decl. at ¶ 48). Moreover, Menendez's December 15, 1565 letter and the accounts of de Méras and Barrientos

all confirm that Menendez and his soldiers marched to Cape Canaveral where they "destroyed the wooden fort of the French near Cape Canaveral" and took prisoner the "Frenchmen from Canaveral." Barrientos likewise identifies to "Cape Canaveral, [as] the site of the Lutheran fort." (Delgado Decl. at ¶¶ 40-42, 48-49, 51-52).

As detailed in the Declaration of Sylvia LeLuc, Head of the Artillery Department of the French Musée de l'Armée, the three bronze cannon photographed by GME at Cape Canaveral in the 2 or more meter deep hole it blew into the site, are unmistakably French culverins which correspond to culverins on the *la Trinité* Register of Artillery as Royal property and armament of *la Trinité*. The LeLuc declaration documents that the GME cannon photographs show the distinctive insignia of King Henri II (r. 1547 - 1559) including his intertwined D monogram[1] and his equally distinctive recurved *arc turcois* insignia. In another GME photograph, a distinctive "B" can be seen at the touchhole of a cannon. An identical "B," the mark of a master cannon founder for the Crown, is on a culverin bearing the date 1548 on prominent display in the central courtyard of the Musée de l'Armée. In other GME photographs, a distinctive hole can be seen in the breech of a cannon. Such holes provided for a rope to be reeved through so as to restrain cannon movement on a warship at sea. The culverins are highly valuable bronze, a metal which was exclusively reserved to the Crown as a royal privilege at a time when "only royal warships carried bronze guns bearing the king's arms." (LeLuc Decl. at ¶¶ 8, 11, 14-17)

Even more distinctive and quite literally unique is the stone monument at the site that "corresponds exactly to the drawings conserved in the French archives that recount the [French] expeditions to Floride." (LeLuc Decl. at ¶ 20). These monuments were intended to mark

---

[1] The Henri II D monogram can also be seen in the personal armor of King Henri II at the Musée de l'Armée. (LuLuc Decl. Appendix 5).

formally la Floride as territory of France and "only a royal ship would have been given the charge of transporting an object so closely linked to the king's power as that of a landmark bearing the arms of France." (LeLuc Decl. at ¶¶ 18-20).  The stone monument is all the more significant "because it is the first of its kind" to have been located in more than 450 years since the fall of New France: no others are known to have survived. (*Id.*).  As the Ambassador of Spain to the Court of King Charles IX reported to King Philip II on January 19, 1566, the Ribault Fleet had been carrying six "marble columns with the arms of this King [Charles IX]" and their loss was "felt keenly".  Delgado Decl. at ¶ 55)

IV.    GME Cannot Be Adjudged Owner or Salvor of the Sovereign Immune *Res* In this Case

Few principles have deeper roots in U.S. law than the immunity of foreign sovereigns' warships from claims in admiralty, beginning, as it happens, with the sovereign immunity of a "national armed vessel" of France.  In 1812, the Supreme Court applied foreign sovereign immunity to dismiss *in rem* claims against a "national armed vessel[] commissioned by, and in the service of the [E]mperor of France," in *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 146 (1812).  *Schooner Exchange* "still resonates" to this day and teaches that "warships have always been accorded a special status." (*Odyssey Marine Exploration*, 675 F. Supp. 2d at 1138 n.13, 1142).[2]  In *Schooner Exchange*, private plaintiffs sought to attach a French "public armed ship" in order to collect a debt.  11 U.S. at 117.  The Supreme Court held that the French "national armed vessel" was immune from admiralty claims in the United States courts. (*Id.* at 118-19).  Chief Justice Marshall wrote for the Court:

> [A public armed ship] constitutes a part of the military force of her nation; acts under the immediate and direct command of the

---

[2] *Schooner Exchange* is "generally viewed as the source of our foreign sovereign immunity jurisprudence." *Republic of Austria v. Altmann*, 541 U.S. 677, 688 (2004).

> sovereign; is employed by him in national objects. He has many
> and powerful motives for preventing those objects from being
> defeated by the interference of a foreign state. Such interference
> cannot take place without affecting his power and his dignity. (*Id.*
> at 144.).

As the law of foreign sovereign immunity has evolved since *Schooner Exchange*,

sovereign immunity of a sunken "public armed ship" such as *la Trinité* has remained in full

effect and arises on at least three doctrinal and/or statutory grounds; first that the *res* is property

of the foreign sovereign; second, immunity is heightened by the special status that "warships

have always been accorded"; and third, by virtue of the compelling interest in comity and

reciprocity between the United States and foreign sovereigns in protection of sunken warships

and military gravesites, and the historical archaeological significance of sites such as *la Trinité.*

A.      Dismissal in Favor of France is Mandated for the *Res* as Property of France

France's motion should be granted and all claims dismissed against the *res* first for the

simple reason that it is property of a foreign state in the United States and therefore immune

under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1609, from arrest or any

other judicial action.

The FSIA codifies foreign sovereign immunity as it has evolved since *Schooner*

*Exchange* (see 675 F. Supp. 2d at 1137-38), and provides that a foreign sovereign's ownership of

the *res* at issue is sufficient in itself to confer, *inter alia*, immunity from arrest unless a statutory

exception is proved. Section 1609 of the FSIA provides that:

> "Subject to existing international agreements to which the United
> States is a party at the time of enactment of this Act the property in
> the United States of a foreign state shall be immune from
> attachment[,] arrest[,] and execution except as provided in sections
> 1610 and 1611 of this chapter." (28 U.S.C. § 1609).

Accordingly, to paraphrase the Eleventh Circuit decision in *Odyssey Marine Exploration*:

> Because § 1609 provides [*la Trinité*] with presumptive
> immunity from arrest on these facts, the only way a federal court
> can obtain jurisdiction is if an exception to § 1609 applies. [GME]
> has the burden of overcoming the presumption that [*la Trinité*] is
> immune from arrest. (678 F. 2d at 1175).

GME can show no such exception. The historical record is explicit that *la Trinité* is property of the Crown, was engaged in the service of His Majesty King Charles IX under Royal orders to sail to New France on a mission to defend and advance France's territorial claims to New France.

There can be no claim that France has abandoned its ownership of *la Trinité* or waived its sovereign immunity. Notice has been given to all U.S. persons and entities that France has reserved all sovereign immunities for its sunken State craft and France's ownership of its sunken State craft is 'inalienable." (Navarri Decl. at ¶ 2 and Ex. 1). France also made its reservation of ownership and all other rights in the Ribault Fleet express even before this action was commenced. *See* Navarri Decl. Ex. 2, Republic of France Diplomatic Note 509584 of July 8, 2016: "as part of a royal fleet of Charles IX, the sunken ship and all its contents are under the ownership of the French Republic." A sunken State craft of France "enjoys sovereign immunities, regardless of its location and the period elapsed since it was reduced to wreckage." (*Id.*).

France has also rejected any salvage or other disturbance of the *res* by GME. France's February 5, 2004 *Federal Register* notice provides that "no intrusive action may be taken regarding a French sunken state craft, without the express consent of the French Republic." (Navarri Decl. Ex. 1). That warning was expressly reiterated in the French July 8, 2016 Diplomatic Note specifically in response to overtures from GME "that the area in which it desires to conduct operations may contain the remains of the French Royal Vessel of the 1656

French Fleet under the command of Jean Ribault and its associated artifacts." (Navarri Decl. Ex. 2).

United States law and national policy recognize that the passage of time since *la Trinité* wrecked has no effect on France's title.  See e.g., *Odyssey Marine Exploration*, 675 F. Supp. 2d at 1143, noting that "the United States 'recognizes that title to a United States or foreign sunken State cart, wherever located, is not extinguished by passage of time, regardless of when such sunken State craft was lost at sea." (quoting January 19, 2011 Presidential Statement on Protection of Sunken Warships, Military Aircraft and Other Sunken Government Property, 69 F.R. 5647-01. 5648 (Feb. 5, 2004).  See also *Sea Hunt v. Unidentified Shipwrecked Vessel*, 221 F.3d 634, 641 (4th Cir. 2001):

> Under admiralty law, where an owner comes forward to assert ownership in a shipwreck, abandonment must be shown by express acts.  See Columbus-America Discovery Group v. Atlantic Mutual Ins. Co. 974 F.2d 450 (4th Cir. 1992).  "[S]hould an owner appear in court and there be no evidence of an express abandonment," title to the shipwreck remains with the owner.  Id. at 461.  This principle reflects the long standing admiralty rule that when "articles are lost at sea the title of the owner in them remains."  The AKABA, 54 F. 197, 200 (4th Cir. 1893).

France's ownership of the *res* is accordingly sufficient in itself to mandate dismissal of this action, even before taking account its "special status" as a sunken warship.

B.      The *Res* has Heightened Sovereign Immunity As a Sunken Warship

The sovereign immunity of the *res* here is heightened by the principle that "warships

have always been accorded a special status, a notion that dates back to the *Schooner Exchange*"

and is carried forward into the Foreign Sovereign Immunities Act by, *inter alia*, the FSIA

mandate to take into account "existing international agreements to which the United States is a

party at the time of enactment."  *See Odyssey Marine Exploration*, 675 F. Supp. 2d at 1148, 28

U.S.C. § 1609.

As the Court observed in *Odyssey Marine Exploration*, 678 F. Supp. 2d at 1143:

> The United States protects its sunken warships.  *See*
> Geneva Convention on the High Seas, Art. 8, April 29, 1958, 13
> U.S.T. 2312, T.I.A.S. No. 5200 ("Warships on the high seas have
> complete immunity from the jurisdiction of any State other than
> the flag State"); Sunken Military Craft Act. Pub.L. No. 108-375,
> § 1406, 118 Stat. 2094 (codified at 10 U.S.C. § 113 note) (October
> 28, 2004) ("The law of finds shall not apply to ... any foreign
> sunken military craft located in United States waters"; and "[n]o
> salvage rights or awards shall be granted with respect to ... any
> foreign sunken military craft located in United States waters
> without the express permission of the relevant foreign state.").

Accordingly, as the Eleventh Circuit stated, the protections accorded sunken property of

another sovereign "are heightened when the sunken vessel is a military vessel."  657 F.3d at

1181.

This heightened protection is further recognized in international law under the United

Nations Convention of the Law of the Sea ("UNCLOS").  Article 95 of UNCLOS provides that

"[w]arships on the high seas have complete immunity from the jurisdiction of any state other

than the flag State."  1833 U.N.T.S. 396, 435, 21 I.L.M. 1261, 1288.  The United States

considers Article 95 a "vital rule" of international law because it "protects and strengthens the

key principle of sovereign immunity for warships and military aircraft.  Although not a new

concept, sovereign immunity is a principle of vital importance to the United States.  The

Convention provides for a universally recognized formulation of this principle." President's

Transmittal of UNCLOS to the Senate, 1995 WL 655157, at *1412 (Oct. 7, 1994).

UNCLOS was preceded by the 1958 Geneva Convention on the High Seas, Article 8 of

which provides in language identical to UNCLOS Article 95 that "Warships on the high seas

have complete immunity from the jurisdiction of any State other than the flag State." Article

8(1), Apr. 29, 1958, 13 U.S.T. 2312, 2315-16, 450 U.N.T.S 81, 82.

These protections have also been codified in U.S. law by the Sunken Military Craft Act

("SMCA"), Pub.L. No. 108-375, §§ 1401-08; 10 U.S.C. § 113 Note. The Sunken Military Craft

Act speaks directly to and bars the law of finds and salvage law claims pleaded by GME in this

case. Section 1406(c) of SMCA provides: "The law of finds shall not apply to ... any foreign

sunken military craft located in United States waters." Section 1406(d) likewise provides that

"[n]o salvage rights or awards shall be granted with respect to - ... any foreign sunken military

craft located in United States waters without the express permission of the relevant foreign

state." The Act further prohibits any unauthorized activity "that disturbs, removes, or injures any

sunken military craft," and defines a "sunken military craft" to include any such vessel that was

"owned or operated by a government [i.e., any government] on military noncommercial service

when it sank." SMCA, Sections 1402 and 1408.

In its response to the Diplomatic Note of France, the United States Department of State

gave due recognition to these principles:

> "[T]he United States, through its Department of the Navy, has been
> in contact with the State of Florida concerning the possible
> authorization of the activities of GME. The Department of the
> Navy has informed the State of Florida of its interest in ensuring
> that foreign sunken military craft are treated in accordance with the
> protections afforded to them by the Sunken Military Craft Act,
> specifically (1) that disturbance, injury, or removal of a foreign
> sunken military craft in United States waters requires the

> authorization of the foreign sovereign, the Secretary of the Navy,
> and/or other appropriate United States government agencies; (2)
> that the law of finds does not apply to any foreign sunken military
> craft located in the United States waters, and (3) that no salvage
> rights or awards shall be granted without the express permission of
> the relevant sovereign." Navarri Decl. Ex. 3.

These considerations are heightened still further by the international comity interests in reciprocity among civilized nations in the protection not only of sunken military vessels as sovereign property and gravesites, but also as unique and irreplaceable archeological and historic sites. In *Odyssey Marine Exploration*, 657 F.3d at 1181, the Eleventh Circuit noted "the heightened protection we grant when there is a potential of injury to the [foreign] sovereign's interest," in accordance with "the promotion of the comity interest that underlies that doctrine [of foreign sovereign immunity]," citing and quoting *Republic of Philippines v. Pimentel*, 553 U.S. 851, 853 (2008).

Comity and reciprocity between the United States and France to recognize each nation's legal and historic interests in sunken State craft fact firmly established as a two-way street. In October 1989, France entered into an agreement with the United States in which each nation "recognized the historical and archeological importance" of the wreck of *CSS Alabama*, a U.S. Civil War Confederate warship sunk off the coast of Cherbourg, France in 1864. France recognized the United States's ownership of the sunken ship and agreed to cooperative measures to protect the wrecksite from unauthorized disturbance. (Navarri Decl. Ex. 4).

Likewise, the United States has officially recognized that *La Belle*, a French shipwreck in the Gulf of Mexico that sank at Matagorda Bay, Texas during a 1684 mission to establish a French colony at the mouth of the Mississippi River, was "an auxiliary vessel of the French Navy" and France "continues to retains title to the wreck as *La Belle*. France and the United

States agreed to appropriate arrangements for security, recovery, conservation, and display of the vessel and its artifacts with the Texas Historical Commission. (Navarri Decl. Ex. 5).

The potential for injury to the interests of France (and equally Florida and the United States) has also already been borne out in the record of this case. *La Trinité* is a unique time capsule of a pivotal event in European and American history and a site of extraordinary archeological importance. As the declaration of the distinguished French historian Frank Lestringant reminds us: "the physical remains of *la Trinité*, and especially the bronze Royal cannons of King Henri II and the territorial marker of King Charles IX that have been located in the sea at the site of *la Trinité*, are embodiments of the highest importance of the shared history and heritage of France, Spain and what eventually became the United States." (Lestringant Decl. at ¶ 44.)[3]

Given the extraordinary importance of the *res* in this case, there is a uniquely compelling comity interest shared by France, the State of Florida and the United States (the latter as entities that eventually succeeded to what was once, albeit briefly, New France), to protect *la Trinité* from an entity that has already damaged the *site* and concealed from the Court that its permit had been revoked.

V.      Conclusion

---

[3]  *See also* Delgado Decl. at ¶ 59:

> "Early colonial period shipwrecks are rare in the American archeological record and are highly significant and irreplacable. . . . The historical and archeological significance of Sixteenth Century shipwreck sites is incalculable and priceless.  This site has equal or greater potential to bring to light the pivotal historic events associated with *la Trinité*.  The site has the highest level of significance in the history and archeology of Florida, the United States and France.

The Republic of France respectfully submits that its Motion to Dismiss for lack of subject matter jurisdiction should be granted with an appropriate decision recognizing that the *res* is *la Trinité*, and therefore sovereign immune property of France which France is entitled to protect from unauthorized disturbance by GME and to preserve for archeological and historical study in the shared public interests of France, Florida and the United States.

Respectfully submitted
this 26th day of September, 2017


s/James A. Goold, Esq.
James A. Goold/Pro Hac Vice
Email: jgoold@cov.com
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-5507
Facsimile: (202) 778-5507

s/Kathleen M. Sales, Esq.
GUTIERREZ & ASSOCIATES
1200 Brickell Avenue
Suite 350
Miami, FL  33131
Tel:  (305) 577-4500
Fax:  (305) 577-8690
Email:  kms@martlaw.com
Secondary Email:  service@martlaw.com


Counsel For The Republic of France

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY  that on this 26 day of September, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will forward the filing to counsel of record for all parties.

/s/Kathleen M. Sales, Esq.
Kathleen M. Sales (FBN: 0143200)
Primary Email:  kms@martlaw.com
Secondary Email: service@martlaw.com
GUTIERREZ & ASSOCIATES
1200 Brickell Avenue
Suite 350
Miami, Florida 33131
Telephone: 305 577 4500
Facsimile: 305 577 8690

*Attorneys for the Republic of France*

By: /s/James A. Goold, Esq.
James A. Goold/Pro Hac Vice
Email: jgoold@cov.com
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-5507
Facsimile: (202) 778-5507

*Attorneys for the Republic of France*