# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

GLOBAL MARINE EXPLORATION,
INC.,

        Plaintiff,

v.                                         Case No:   6:16-cv-1742-Orl-KRS

THE UNIDENTIFIED, WRECKED AND
(FOR FINDERS-RIGHT PURPOSES)
ABANDONED SAILING VESSEL,

        Defendant.

_____

# ORDER
(And Directions to the Clerk of Court)

      This cause came on for consideration without oral argument on the following motions filed

herein:

| MOTION: | CLAIMANT REPUBLIC OF FRANCE MOTION TO DISMISS (Doc. No. 75) |
|---|---|
| FILED: | September 26, 2017 |

| MOTION: | CLAIMANT STATE OF FLORIDA'S AMENDED DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY OF PLAINTIFF'S WITNESSES (Doc. No. 96) |
|---|---|
| FILED: | February 23, 2018 |

| MOTION: | CLAIMANT STATE OF FLORIDA'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 97) |
|---|---|
| FILED: | February 23, 2018 |

I.     **PROCEDURAL BACKGROUND.**

This is an *in rem* action involving competing claims to a shipwreck (the *res*) that Plaintiff, Global Marine Exploration, Inc. ("GME"), discovered near Cape Canaveral, Florida.   The parties dispute the identity of the *res*, but the Republic of France claims that it is *la Trinité*, the flagship of the Royal Navy of France 1565 Fleet of Captain Jean Ribault.   As discussed below, the sinking of *la Trinité* played a pivotal role in France's abandonment of attempts to take possession of Florida and the eventual dominance of Spain in colonizing Florida.

GME instituted its *in rem* action in this Court on October 5, 2016.   Doc. No. 1.   It named as the Defendant the "Unidentified, Abandoned Shipwrecked Vessel, if any, its apparel, tackle, appurtenances and cargo, if any, located within an area enclosed by a line running from 28.558002˚ -80.509884˚ to 28.520537˚ -80.557306˚ to 28.467799˚ -80.469405˚ and returning to 28.473599˚ -80.532415˚ . . . ." ("Defendant Vessel"). Doc. No. 1, at 1.   GME alleged that it discovered the Defendant Vessel and that, upon information and belief, "any and all efforts by any previous owners and/or other parties and/or other entities to salvage the wreckage have been long since abandoned, with the exception of looters, who make no effort to report or document their work."   *Id.* ¶ 5.   It alleged that, "[w]hile some of the artifacts are believed . . . to be from the 1550 to 1650 time period, the ages and identities of the vessels making up the Defendant Site have not been determined . . . because [GME] has yet to find any object in the salvage area that might be used to accurately date and identify the wreckage."   *Id.* ¶ 11.   GME set forth four (4) claims: (1) a possessory and ownership claim pursuant to the law of finds, whereby GME claimed entitlement to an adjudication of "title and ownership in the Defendant Site, and her artifacts, and the right to recover the Defendant Site and her artifacts," *id.* ¶¶ 16-17; (2) a salvage award claim pursuant to the law of salvage, whereby GME claimed entitlement to a "liberal salvage award" for its salvage services, *id.* ¶¶ 18-

20; (3) a request for a declaratory judgment that, among other things, declares that no government has the authority to interfere with GME's exploration and recovery of the Defendant Site, *id.* ¶¶ 21-23; and (4) a claim for a preliminary injunction prohibiting any rival salvors or entity from conducting search and/or recovery operations at the Defendant Site, *id.* ¶¶ 24-26.

Upon motion by GME, the Court then issued a warrant of arrest *in rem*. Doc. Nos. 10, 11. The U.S. Marshals Service arrested the Defendant Vessel constructively by seizing a number of salvaged artifacts. The U.S. Marshals Service subsequently surrendered those artifacts to GME, which the Court had appointed as substitute custodian. Doc. No. 14, 15. GME then complied with the publication requirement of Local Admiralty Rule 7.03(d)(1). No claims or answers were filed in the 14 days following publication, and GME represented that it was unaware of any intervenors in this action. Thus, upon motion by GME, the Court issued a Clerk's default against the Defendant Vessel. Doc. Nos. 17, 19, 20.

Less than a week after the Clerk's default was entered, the Republic of France appeared in this action. It filed a verified claim to the Defendant Vessel in which it contended that the *res* is from the French Royal Fleet of 1565 commanded by Jean Ribault and sunk by a hurricane in the vicinity of what is now Cape Canaveral, Florida. Doc. No. 26. In its claim, it asserted that it had not abandoned its sovereignty over the vessel. *Id.* At the same time, the Republic of France also filed a motion to set aside the Clerk's default, which was granted. Doc. Nos. 30, 34. A few days later, the State of Florida appeared in the case and filed a verified claim to the Defendant Vessel. Doc. Nos. 36, 41. The State of Florida made clear that its claim was expressly subordinate to the claim of the Republic of France and that it supported the Republic of France's claim to the Defendant Vessel. It contended that, if the *res* is not a sovereign ship of the Republic of France, the State of

Florida would be its owner because it is embedded in the sovereign submerged lands of the State of Florida and has been abandoned by its previous owner.   Doc. No. 41.

In its motion to set aside the Clerk's default, the Republic of France filed documents suggesting that GME may have made certain misrepresentations in its verified complaint and that GME was not properly in possession of the artifacts it presented to the Court for constructive arrest. Accordingly, I issued an Order to Show Cause requiring GME to show cause, in writing, why the orders granting its motion for issuance of a warrant of arrest *in rem* and its motion to be appointed substitute custodian should not be vacated as having been improvidently granted.   Doc. No. 33.

Thereafter, I held a telephonic status conference.   Doc. No. 43.   Following the status conference, I entered an Order vacating my previous Order appointing GME as the substitute custodian and appointing the State of Florida, Bureau of Archaeological Research as the new substitute custodian in this case.   In that Order, I also prohibited further recovery activity on the Defendant Vessel pending further Order of the Court.   Doc. Nos. 45-46.

In the meantime, GME filed a response to my Order to Show Cause. Doc. No. 37.   The Republic of France and the State of Florida replied to that response, Doc. Nos. 54, 56, after which GME supplemented its response with additional evidence, Doc. Nos. 55, 57-63.   The State of Florida also filed an affidavit in which it detailed certain apparent problems with the manner in which GME transferred the artifacts to the State of Florida pursuant to my Order appointing the State of Florida as the new substitute custodian.   Doc. No. 64.

Following an additional telephonic status conference, I withdrew the Order to Show Cause, subject to reconsideration, if appropriate, after the issue of subject matter jurisdiction was resolved. Doc. No. 68.   I also set a schedule for the briefing of the Republic of France's motion to dismiss,

as well as a schedule for discovery and summary judgment briefing as to the State of Florida's claim. Doc. Nos. 70, 71.

Ultimately, the Republic of France filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), arguing that the Court lacks subject matter jurisdiction because the *res* is the French Royal Vessel *la Trinité* and has immunity from GME's claims. Doc. No. 75. It supported its motion with more than 800 pages of evidence, including declarations from (1) Marie-Laurence Navarri, a Magistrate Judge of the Republic of France and Attaché for Judicial Affairs of the Embassy of France to the United States (Doc. No. 75-1); (2) Frank Lestringant, a historian and Professeur des Universités at the Université de Paris-Sorbonne (Doc. Nos. 75-2 through 75-13, 81-14 through 81-29, and 104, at 5-14 (CM/ECF page numbers)[1]); (3) Sylvie Soria Leluc, head of the Artillery Department at the Musée de l'Armée in Paris (Doc. No. 75-14); and James P. Delgado, Ph.D., RPA, a maritime archaeologist and maritime historian (Doc. Nos. 75-15 through 75-26, 81-1 through 81-13, 84-1, at 4-20 (CM/ECF page numbers), and 104, at 15 through 25 (CM/ECF page numbers)). The declarations of Lestringant and Delgado were supported by primary source materials (with translations) as well as excerpts from various treatises.

GME filed a response to the Republic of France's motion to dismiss. Doc. No. 79. It supported its motion with declarations from Dr. Robert H. Baer, a professional archaeologist (Doc. Nos. 79-1 and 79-2) and Robert F. Marx, a maritime archaeologist and historian (Doc. Nos. 79-3 through 79-4). It also filed an excerpt from what appears to be the introduction to a translation of

---

[1] The Republic of France encountered technical difficulties when filing its exhibits. Some of the exhibits to the Lestringant and Delgado declarations were omitted when the Republic of France's motion was originally filed, but were subsequently added to CM/ECF as Doc. Nos. 81-1 through 81-29, Doc. No. 84-1, at 4-20 (CM/ECF page numbers), and Doc. No. 104.

a primary source document (Doc. No. 79-5), excerpts from two treatises (Doc. Nos. 79-6 and 105[2]),

and a journal article (Doc. Nos. 79-7 and 79-8).   With leave of court, the Republic of France filed

a reply, Doc. No. 84, which was supported by a declaration from the Republic of France's counsel

(Doc. No. 84-1) and a declaration from John de Bry, Ph.D., an historian (Doc. No. 84-2).

After filing an answer (Doc. No. 72) and conducting discovery, the State of Florida filed a

*Daubert* motion to exclude GME's experts (Doc. No. 96) and a motion for partial summary

judgment (Doc. No. 97), both of which were supported by evidence.   GME filed responses in

opposition to both motions.   Doc. Nos. 98, 99.

Before the Republic of France and the State of Florida filed their claims, GME consented to

a magistrate judge conducting all proceedings in this case, including trial, the entry of judgment,

and all post-trial proceedings.   Doc. No. 6.   Based on that consent, the presiding District Judge

referred the case to me for all purposes.   Doc. No. 8.   The Republic of France and the State of

Florida ratified that consent after they appeared in the case.   Doc. No. 47.   Thus, the pending

motions are properly before me, and they are ripe for review.

After conducting a thorough review of the parties' briefs, as well as all of the evidence filed

in support of their motions, and for the reasons explained below, the Court concludes that the

Republic of France has established, by a preponderance of the evidence, that the *res* is the French

sovereign vessel, *la Trinité*, and, thus, that the Republic of France's motion to dismiss for lack of

subject matter jurisdiction is due to be granted.

---

[2] This document was originally omitted from GME's filing, but the Court allowed GME to supplement the record by filing the missing document.   The document was filed as Document Numbers 105-1 and 105-2.

## II.     REPUBLIC OF FRANCE'S MOTION TO DISMISS.

A.     Legal Standards.

1.     *Analytical Standard for a Fed. R. Civ. P. 12(b)(1) Motion.*

The Republic of France brings a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).   As detailed elsewhere in this Order, it makes a factual attack to the Court's subject matter jurisdiction over the *res*.   The Eleventh Circuit addressed the standard for deciding such a motion to dismiss *in rem* claims against a sovereign vessel in *Odyssey Marine Exploration, Inc. v. The Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011) ("*Odyssey Marine Appeal*").   In the *Odyssey Marine Appeal* opinion, the Eleventh Circuit concluded, "[W]hen a party raises a factual attack to subject matter jurisdiction   . . . the district court is not obligated to take the allegations in the complaint as true.   Instead, the court may consider extrinsic evidence such as deposition testimony and affidavits [and] may independently weigh the facts and is not constrained to view them in the light most favorable to the non-movant."   *Id.* (internal quotation omitted).

In this case, the parties agree that the Republic of France bears the burden of proving by a preponderance of the evidence that the Court lacks subject matter jurisdiction—that is, that sovereign immunity applies to the *res*.   Doc. No. 75, at 6-7 (quoting *Odyssey Marine Exploration, Inc. v. The Unidentified Shipwrecked Vessel*, 675 F. Supp. 2d 1126, 1138 (M.D. Fla. 2009) ("*Odyssey Marine District Court*")*, aff'd*, *Odyssey Marine Appeal*; also citing *Odyssey Marine Appeal*, 657 F.3d at 1175); Doc. No. 79, at 1 ("Plaintiff also agrees that in this Motion to Dismiss,

France has the burden to prove that the *res* is the Trinite by a preponderance of the evidence").[3]

When resolving factual disputes underlying a Rule 12(b)(1) motion, a district court may consider

oral evidence along with written evidence, but it is not required to do so.   *Odyssey Marine Appeal*,

657 F. 3d at 1170 (citation omitted).   Because the parties have submitted detailed evidence that

largely relates to historical events and neither party has requested an evidentiary hearing, the Court

concludes that it does not require oral testimony to decide the Republic of France's motion to

dismiss.

### 2.       *Admiralty Principles and the Foreign Sovereign Immunities Act.*

An *in rem* action against a vessel—such as the action GME pursues in this case—is an

admiralty proceeding and falls within the exclusive province of the federal courts.   *Id.* at 1171

(citations omitted).   Although federal courts have the exclusive power to adjudicate *in rem* suits

against a vessel, that power is dependent on the court's jurisdiction over the *res*—that is, the property

---

[3] The Court notes that the "preponderance of the evidence" portion of the *Odyssey Marine Appeal* opinion was referring to the burden of proof if a plaintiff claims that an exception to the Foreign Sovereign Immunities Act applies. *Odyssey Marine Appeal*, 657 F.3d at 1176 (internal citations omitted) ("Because §1609 [of the FSIA] provides the *Mercedes* with presumptive immunity from arrest on these facts, the only way a federal court can obtain jurisdiction is if an exception to § 1609 applies.   [The plaintiff] has the burden of overcoming the presumption that the *Mercedes* is immune from arrest.   If [the plaintiff] offers evidence one of the FSIA exceptions to immunity applies, the burden shifts back to Spain to show, by a preponderance of the evidence, that the exception does not apply.").   It does not appear to illuminate the burden of proof for establishing that the *res* is *la Trinité* and, thus, entitled to presumptive immunity from arrest.   Nonetheless because the *Odyssey Marine District Court* opinion, which was affirmed by the Eleventh Circuit, appears to have required the foreign sovereign to prove the identity of the *res* (the *Mercedes*) by a preponderance of the evidence and the parties agree on the burden of proof, that is the standard the Court applies.   *See Odyssey Marine District Court*, 675 F. Supp. 2d at 1133 (internal quotation omitted) ("[D]espite conceding its leading hypothesis is that the recovered cargo came from the *Mercedes*, [the plaintiff] argues that the Court should still entertain doubt because at the current level of site reconnaissance and study, there is no definitive archaeological evidence and all evidence pointing toward that theory remains circumstantial.   This argument is wrong . . . . It ignores the applicable standard of proof (preponderance of the evidence) and instead promotes something bordering on proof beyond a reasonable doubt.")   The alternative would be to require GME to establish that the *res* is not *la Trinité*—and, thus, that subject matter jurisdiction is appropriate—by a preponderance of the evidence.   *See Harris v. Bd. Of Trustees of Univ. of Ala.*, 846 F. Supp. 2d 1223, 1232 (N.D. Ala. 2012) (quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)) ("If a defendant makes a factual attack upon the court's subject matter jurisdiction, submitting evidentiary materials, the plaintiff is 'also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.'").   Because the Court finds that the Republic of France has established that the *res* is *la Trinité* by a preponderance of the evidence, it goes without saying that GME has failed to establish by a preponderance of the evidence that the *res* is not *la Trinité*.

named as the defendant. *Id.* (citation omitted). "Only if the court has exclusive custody and control over the property does it have jurisdiction over the property so as to be able to adjudicate rights in it that are binding against the world." *Id.* (internal quotation omitted). "Therefore, when a party files an *in rem* complaint, the court issues a warrant for the arrest of the *res*, and the *res* remains in the court's custody for the remainder of the proceedings." *Id.* (citations omitted).

"If the *res* at issue is the property of a foreign state, the federal courts only have jurisdiction to arrest the *res* if authorized by the [Foreign Sovereign Immunities Act ("FSIA")]." *Id.* (citing 28 U.S.C. § 1609; *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1324 (11th Cir. 2003)). A foreign state, or its property, is "presumptively immune from the jurisdiction of the United States courts; unless a specified [statutory] exception applies, a federal court lacks subject-matter jurisdiction." *Odyssey Marine District Court*, 675 F. Supp. 2d at 1138 (M.D. Fla. 2009)*, aff'd*, *Odyssey Marine Appeal*, 675 F.3d 1159 (internal quotation and citation omitted).

### 3.     *Application to this Case.*

GME agrees that these legal standards apply to this case, and it does not assert that any exceptions to the FSIA apply. It also does not dispute that *la Trinité* was, in fact, the property of the Republic of France. Accordingly, it agrees that, if the Court determines that the *res* is *la Trinité*, then the Court lacks subject matter jurisdiction over the *res*. Doc. No. 79, at 1. It also agrees that the Republic of France has the burden to prove by a preponderance of the evidence that the *res* is *la Trinité*. The lone issue to be decided, then, is a question of fact: Is the *res la Trinité*? The Republic of France contends that it is. GME contends that the Republic of France has failed to meet its burden of proving by a preponderance of the evidence that the *res* is *la Trinité*.

B.      Facts and Findings.

1.      *Background Facts.*

In order to determine whether the *res* is *la Trinité*, it is necessary, first, to delve into the history of French and Spanish attempts to settle modern-day Florida.   In 1552, a prominent French nobleman, Gaspard de Coligny, Lord of Châtillon, was appointed Admiral of France for King Henri II.   Declaration of Frank Lestringant ("Lestringant Dec."), Doc. No. 75-3 ¶ 13.[4]   As of 1562, Spain had conquered and colonized much of the Caribbean, Central America, and South America; it had not, however, achieved what France considered "established occupation" in the Americas north of Havana.   *Id.* ¶ 16.   As a result, the French Crown and Coligny considered the continental United States to be unclaimed and, therefore, open to French colonization and territorial claims.   *Id.*

In 1562, Coligny appointed Jean Ribault to command a French Royal Department de la Marine (Department of the Navy) fleet of two ships on a mission to establish permanent French occupation on the southeast coast of North America, an area commonly labeled "La Floride" or "La Florida" on contemporary maps.   *Id.* ¶ 17.   Ribault hailed from Dieppe, France.   *Id.*   Ribault's 1562 fleet had two ships.   *Id.* ¶ 18.   They sailed from France in February 1562 and made landfall near the present-day St. John's River on April 30, 1562.   *Id.*   Ribault referred to this river as the "River of May."   *Id.*   On raised land at the mouth of the river, Ribault placed, in his own words, a "piller or colume of hard stone, our king's armes graven therein."   *Id.* and Ex. 4 thereto (Doc. No. 104, at 76, Jean Ribault, *The Whole & True Discoverue of Terra Florida* 76 (1927 English

---

[4] Lestringant relied on a number of treatises and primary source materials to support his declaration.   *See* Doc. Nos. 75-13, 81-14 through 81-29.   Because pinpoint citations to those sources can be found in his declaration, I do not also include citations to the supporting treatises and primary source materials, unless the treatise or primary source material is of particular importance.

translation)).[5]   Planting such a marker was a way of making a formal territorial claim.   Lestringant

Dec., Doc. No. 75-3 ¶ 18.   Ribault then sailed north, eventually arriving at a site that is now believed

to be on the south side of Port Royal Sound, near present-day Parris Island, Georgia.   *Id.* ¶ 19.

Ribault planted "another colme graven with the Kinges armes" at "a high place."   *Id.* and Ex. 4

thereto (Doc. Nos. 81-14, at 94, and 81-15, at 95).   He then visited what is now known as Parris

Island and decided that it was a suitable location for a settlement.   Lestringant Dec., Doc. No. 75-

3 ¶ 19.   He left a number of men there and instructed them to build a fort named Charlesfort in

honor of King Charles IX of France.   *Id.*   Ribault sailed for France in June 1562 and was expected

to return with supplies and reinforcements for Charlesfort in 1563.   *Id.*   As it happened, Ribault

was not able to return as planned.   *Id*. ¶ 20.   The Charlesfort settlement was abandoned in early

February 1563 when all but one of the inhabitants sailed for France.   *Id.* ¶ 22.   A small boat

carrying survivors reached England in October 1563.   *Id.*

In 1564, Coligny dispatched a new mission to La Floride under the command of Captain

René Goulaine de Laudonnière.   *Id.* ¶ 23.   On arrival, de Laudonnière visited the stone monument

that Ribault had placed at the mouth of the River of May in 1562.   *Id.* ¶ 24.   He was accompanied

by an artist, who made a watercolor drawing of the monument.   *Id.*   A copy of a 1591 engraving

made by Theodore de Bry from that watercolor is in the record as Document Number 81-17.

Laudonnière then went upstream and selected a site for a new fort on the inland riverbank.

Lestringant Dec., Doc. No. 75-3 ¶ 24.   That fort was named Fort Caroline.   *Id.*   Although the exact

location of Fort Caroline remains unknown, it was located on the southern side of the present-day

---

[5] Throughout this Order, unless otherwise noted, citations are to the original page numbers, not the page numbers assigned when a document was filed on CM/ECF.

St. John's River, in or near present-day Jacksonville, Florida.   *Id.* and Ex. 6 thereto (Doc. No. 81-18); *see also* Doc. No. 75-20, at 85.

   *2. The 1565 Ribault Fleet.*

  In April 1565, Coligny commissioned Ribault to command a fleet of ships to resupply and reinforce Fort Caroline.   Lestringant Dec., Doc. No. 75-3 ¶ 26.   As vessels of the royal fleet of King Charles IX and engaged in the service of the French Crown, the Ribault fleet was under the ownership of the Republic of France.   Declaration of Marie-Laurence Navarri, Doc. No. 75-1   ¶¶ 1-2.   The Ribault fleet sailed from Dieppe and consisted of seven ships, with *la Trinité* as the flagship.   Lestringant Dec., Doc. No. 75-3 ¶ 26.   The May 1565 Registers of Artillery for the Ribault fleet are in the record as Document Numbers 81-22 and 81-23.   The Register of Artillery for *la Trinité* records the following:

> For the ship La Trinite
>
> State of the artillery pieces both of bronze and iron, powder, cannonballs and every other type of munitions and utensils dependent of the said artillery which will be leased and delivered by the treasurer and general guard of the Navy's artillery and munitions in Normandy according to the decree and order of My Lord the Admiral in the hands of Jan Ribault ordinary captain in the Navy, chief and conductor of the ships the King sends presently to the country of New France.

Doc. No. 81-22, at 6-7 (CM/ECF page numbers) (John deBry Translation); *see also id.* at 9-10 (CM/ECF page numbers) ("all and each of the pieces of artillery of bronze as well as iron, powder, cannonballs, and all sorts of other utensils and munitions contained and specified in the inventory herein written, the whole *for the arming of the said ship* . . . ") (emphasis added).   The Register of Artillery also includes under the heading "Cannonballs," three pounds of sewing thread and fifty needles.   *Id.* at 8-9.   The Register of Artillery identifies the bronze artillery on *la Trinité* as including a total of eight culverins, two of which are described as "small."   Declaration of Sylvie

Soria Leluc ("Leluc Dec."), Doc. No. 75-14 ¶ 17 and Appendix 7 thereto; Doc. No. 81-22, at 7 (CM/ECF page numbers).

The Ribault fleet sailed from Dieppe in mid-May 1565.   Lestringant Dec., Doc. No. 75-3 ¶ 36.

> 3.    *Spain's Reaction to French Activity in Florida.*

Meanwhile, the Spanish learned about the 1562 Ribault fleet, its establishment of a settlement in present-day Florida, and its erection of monuments marking French territorial claims. Doc. No. 75-16 ¶ 19, Declaration of James P. Delgado ("Delgado Declaration").[6]  When this information reached Madrid, Royal orders were issued directing the Governor and Captain General of Havana to investigate the reports of French activity in Florida and eradicate any French presence. *Id.*  By orders issued on April 29, 1564, the frigate *La Concepción*, which was commanded by Captain Hernando Manrique de Rojas, was dispatched from Havana to search the coast for French markers and to destroy a French fort the Spanish believed to be located at 32 degrees north.  *Id.* De Rojas was ordered to bring to Havana or to destroy a stone column or marker "bearing the arms of France" said to be at 29 degrees north, and another such column said to be at 30 degrees north, and then proceed to the French fort believed to be at 32 degrees north.  *Id.*  He was directed to drive out any French he encountered and "raze the fort so completely that no trace of it shall remain." *Id.*

The de Rojas mission searched along the Atlantic coast beginning at 27-and-a-half degrees north, but found no sign of the French until it reached present-day Georgia (32-and-a-third degrees

---

[6] Delgado relied on a number of treatises and primary source materials to support his declaration.  *See* Doc. Nos. 75-17 through 75-26, 81-1 through 81-13, and 84-1, at 4-20 (CM/ECF page numbers).  Because pinpoint citations to those sources can be found in his declaration, I do not also include citations to the supporting treatises and primary source materials, unless the treatise or primary source material is of particular importance.

north).   *Id.* ¶ 20.   There, they encountered the lone French person remaining from the 1562 group that was left to build and occupy Charlesfort.   *Id.*   He informed de Rojas that one territorial marker had been placed by the 1562 Ribault fleet "in the place on the coast where they first explored" but he could not provide further details as to its location.   *Id.* ¶ 21.   He also guided de Rojas to the abandoned Charlesfort settlement and the stone monument that had been placed at Charlesfort in 1562.   *Id.*   The marker was then placed on *la Concepción* and transported back to Havana.   *Id.* ¶¶ 21-22 and Ex. 5 thereto (Doc. No. 75-26, Translation of the Report of Manrique de Rojas, from Charles E. Bennet, *Laudonnière & Fort Caroline: History and Documents* 121-23 (2001)).   There is no record that the de Rojas mission ever located the other stone marker placed by the 1562 Ribault expedition.   Delgado Dec., Doc. No. 75-16 ¶ 22.

In March 1565, King Philip II of Spain commissioned Pedro Menéndez de Aviles to lead a renewed effort to establish permanent Spanish occupation of present-day Florida.   *Id.* ¶ 23. Menéndez's mission became urgent when the Spanish learned about the establishment of Fort Caroline by the French and Ribault's planned return to reinforce and resupply Fort Caroline.   *Id.* ¶¶ 25-28.   The majority of Menéndez's fleet sailed from Cadiz on June 29, 1565.   *Id.* ¶ 30. Menéndez's fleet made landfall at 28 degrees north, near Cape Canaveral, on August 28, 1565.   *Id.* ¶ 31.   His fleet then sailed north in search of Fort Caroline and the Ribault fleet.   *Id.*

### 4.   *The Sinking of the 1565 Ribault Fleet.*

Coincidentally, Ribault's fleet first made landfall south of Fort Caroline, then arrived off the River of May (the present-day St. John's River) on August 28, 1565—the same day that Menéndez's fleet made landfall in Florida.   Lestringant Dec., Doc. No. 75-3 ¶ 36.   Three of the smaller ships of the Ribault fleet were able to pass over the bar at the river mouth and sail upriver to anchor near Fort Caroline, but *la Trinité* and three other, larger ships anchored offshore of the bar.   *Id.*

During the night of September 4, 1565, the warships of the Menéndez fleet approached the Ribault fleet ships that were anchored offshore.   *Id.* ¶ 38; Delgado Dec., Doc. No. 75-16 ¶ 32.   The Ribault ships cut their anchor cables and sailed away.   Lestringant Dec., Doc. No. 75-3 ¶ 38; Delgado Dec., Doc. No. 75-16 ¶ 32.   Menéndez attempted to chase them, but was not able to gain on them, so the next day, Menéndez sailed south toward the St. Augustine Inlet.   Lestringant Dec., Doc. No. 75-3 ¶ 38; Delgado Doc. No. 75-16 ¶ 33.   He went ashore at the harbor, which he named St. Augustine, and claimed the land and coast for the Spanish king.   Delgado Dec., Doc. No. 75-16 ¶ 33.   At least one of the Ribault ships followed and observed that Menéndez had anchored and was setting up a base at the St. Augustine Inlet.   Lestringant Dec., Doc. No. 75-3 ¶ 38.   That information was relayed to Ribault, who had come ashore at Fort Caroline.   *Id.*   Ribault decided to attack Menéndez.   *Id.*   On September 8, 1565, *la Trinité* and other ships of the Ribault fleet left their anchorage and sailed south toward the St. Augustine Inlet.   *Id.*

On September 10, 1565, four Ribault fleet ships approached Menéndez's ships, which were anchored offshore of the St. Augustine Inlet.   Delgado Dec., Doc. No. 75-16 ¶ 35.   All of the Spanish ships were able to enter St. Augustine Inlet and anchor under the cover of cannons that had been landed there.   *Id.*   This was considered "miraculous[] at this low tide for there was only a scant fathom and a half of water on the bar."   *Id.* and Ex. 7 thereto (Doc. No. 81-2, at 426, Translation of Menéndez letters from the Massachusetts Historical Society).   Ribault's ships, however, were not so lucky.   In a letter written on October 15, 1565, Menéndez reported that, after his ships had reached safety, "a hurricane and terrible storm came upon [the Ribault ships]."   Doc. No. 81-2, at 426; *see also* Lestringant Dec., Doc. No. 75-3 ¶ 39 and Ex. 12 thereto (Doc. No. 81-25, at 161, Translation of Laudonnière, *Three Voyages*) ("such a great storm came up, with such heavy winds, that the Indians assured me that it was the worst that had ever come to the coast").

Menéndez's second-in-command, Gonzalo Solís de Merás, reported that Menéndez called a meeting of his officers at which he stated that "the wind is too contrary for [the French] to return to their harbor and fort, and to all appearance it will last for so many days," thereby confirming that the hurricane winds came from the north or northeast and drove Ribault's ships to the south.   Delgado Dec., Doc. No. 75-16 ¶ 37 and Ex. 8 thereto (Doc. No. 81-3, at 91, Translation of Gonzalo Solís de Merás, *Pedro Menéndez de Avilés: Memorial* ("*de Merás Memorial*")).   Because he had concluded that the Ribault fleet could not have returned to Fort Caroline, Menéndez ordered his soldiers to prepare to attack.   Delgado Dec., Doc. No. 75-16 ¶ 37.

> *5.*     *Aftermath of the Sinking of the 1565 Ribault Fleet.*

On September 18, 1565, Menéndez and 500 soldiers set out on a three-day march from St. Augustine north to Fort Caroline.   *Id.* ¶ 38.   On September 21, 1565, they reached Fort Caroline. *Id.*   Fort Caroline's troops were depleted, and Menéndez's forces quickly stormed and captured it, killing all of the soldiers there.   *Id.* ¶¶ 38-39; Lestringant Dec., Doc. No. 75-3 ¶ 40.   A detailed inventory was prepared of the French supplies and weapons that had been captured, and Menéndez returned to St. Augustine.   Delgado Dec., Doc. No. 75-16 ¶ 39 and Ex. 7 thereto (Doc. No. 81-2, at 429; Doc. No. 104, at 430).

On September 28, 1565, local Timucua Indians came to St. Augustine and reported to Menéndez that "there were many Frenchman about six leagues from here, at the sea-shore, who had lost their ships, and had escaped by swimming."   Delgado Dec., Doc. No. 75-16 ¶ 40 and Ex. 7 thereto (Doc. No. 81-2, at 427).   Menéndez took 40 of his soldiers to intercept the French at the barrier island now known as Anastasia at present-day Matanzas Inlet.   *Id.*   His October 15, 1565 letter reports that a master of one of the French ships told him that "a storm and hurricane had struck them so that, about 20 or 25 leagues from here, three of them had gone to the bottom . . . ."   Doc.

No. 81-2, at 428.   The French captain also disclosed that "Juan de Rivao, with his flag-ship was five leagues away from them, anchored in three fathoms, near some shoals . . . , which they think is certainly lost."   *Id*.   At the time, a league was not a standardized measure of distance, ranging from 3-4 kilometers (French leagues) to 5.2 kilometers (Spanish sea leagues) to more than 6.3 kilometers (Spanish land leagues).   Delgado Dec., Doc. No. 75-16 ¶ 42 n. 5.

The French survivors at Anastasia surrendered to Menéndez.   After being interrogated about their religion, those who acknowledged they were Protestants were executed at what has become known as the Matanzas ("Massacre") Inlet.   *Id.* ¶ 43.   The remaining French survivors were spared and marched back to St. Augustine with Menéndez.   *Id.*

Menéndez reported that, on October 10, 1565, Timucua Indians returned to St. Augustine and told him that a second group of French shipwreck survivors had again arrived at the south side of the Matanzas Inlet.   *Id.* ¶ 44.   Menéndez left St. Augustine with 150 soldiers on foot and arrived at the north side of the Matanzas Inlet on October 12, 1565.   *Id.*   Once there, a French representative asked Menéndez that the French survivors, who included Ribault, be granted safe passage back to Fort Caroline.   *Id.* ¶ 45.   Menéndez declined, but agreed to meet with Ribault. Eventually, Ribault and about 70 of his companions surrendered to Menéndez.   *Id.* ¶ 46.   All but five of those were "put to the knife," including Ribault.   *Id.* ¶ 47.   Menéndez again returned to St. Augustine.   *Id.*

On October 15, 1565, Menéndez learned about a third group of French survivors, this time at Cape Canaveral, where *la Trinité* had wrecked:

> I received information from the Indians, that 70 or 80 Frenchmen were collected together, building a Fort at *Cape Canaveral* and a vessel to send to France to ask for succor, and that they had much artillery and munitions that they had removed from the flagship of Juan Rivao, *that had been lost there*, and that about 30 leagues from the place where they were is the beginning of the cape of the Bahamas Channel.

*Id.* ¶ 48 and Ex. 7 thereto (Doc. No. 84-1, at 440, Translation of December 5, 1565 Menéndez Letter from the Massachusetts Historical Society).   On November 2, 1565, Menéndez left St. Augustine with approximately 300 soldiers on foot and three supply boats.   In a December 5, 1565 letter, Menéndez reported that, "on All Saints' Day in the morning we came upon them, the barks by sea, and I by land."   Doc. No. 75-16, ¶ 49; Doc. No. 84-1, at 440.   Menéndez's troops were discovered before they could attack, and the French survivors "took flight to the mountain."   *Id.*   Menéndez's troops then "put in a place of safety six pieces of artillery that [the French] had and the powder and ammunition with which they were moderately provided, and burned and razed the fort, and also burned the bark which was nearly finished."   *Id.*   His second-in-command, de Merás, reported that Menéndez's troops "buried the artillery, as the boats could not carry it because they were small." Delgado Dec., Doc. No. 75-16 ¶ 49 and Ex. 8 thereto (Doc. No. 81-4, at 126, *de Merás Memorial*). "Seeing that the mountain was so thickly wooded that [his troops] could not catch any of them . . . , [Menéndez] sent a French trumpeter . . . into the mountain to tell them to surrender . . . and that, if they would come to [him], [he] would spare their lives."   *Id.*   They all came, except for four or five men.   *Id.*   Unlike he did during his previous encounters with the French, Menéndez allowed the castaways to surrender and spared their lives.   Delgado Dec., Doc. No. 75-16 ¶ 49.   In recounting these events, de Merás stated that Menéndez destroyed the wooden fort of the French "near Cape Canaveral" and that he took "20 of the Frenchmen from Canaveral" with him after destroying the fort.   Doc. No. 81-4, at 123, 127.

From there, Menéndez led his soldiers and his French prisoners on a march south to another harbor called "Ais," where an encampment was set up.   Menéndez, his soldiers, and the French prisoners then made their way to Havana.   Delgado Dec., Doc. No. 75-16 ¶ 50.

By January 19, 1566, the French Court had received word that the Ribault fleet had been lost.   Delgado Dec., Doc. No. 75-16 ¶ 55.   Don Frances de Alva, the Spanish Ambassador to King Charles IX of France, reported to Spanish King Phillip II as follows[7]: "Of the captain who went from Bordeaux in the small ship of which I have written your majesty, to Florida, it is also understood here that a Spanish ship sent it to the bottom and they felt this keenly because it carried six marble columns with the arms of this king and many epitaphs to put them in the fort of la Florida."   *Id.* and Ex. 9 thereto (Doc. No. 81-6, John de Bry Translation of de Alva Letter).

With the loss of Fort Caroline and the Ribault fleet, France abandoned its goal of taking possession of La Floride as French territory and ceased to contest the rapid progression of Spanish control that followed the establishment of St. Augustine.   Lestringant Dec., Doc. No. 75-3 ¶ 44.

6.     *GME's Discoveries.*

GME is in the business of ocean exploration, research, archaeological study, and the recovery and salvage of shipwrecks.   Doc. No. 1 ¶ 1.   GME "discovered the Defendant Unknown Wrecked Vessel," *id.* ¶ 5, near Cape Canaveral, Florida.   Doc. No. 75-19, at 12 (CM/ECF page numbers) (noting that GME discovered debris fields on the north side of Cape Canaveral) and 21 (CM/ECF page numbers) (showing the project location as being north of the Cape Canaveral Inlet). As relevant here, it found three bronze cannons.   *Id.* at 9-10, 12-16 (CM/ECF page numbers).   Two of the cannons were ten feet long, and one was seven-and-a-half feet long.   Doc. No. 75-20, at 29-30 (CM/ECF page numbers); Doc. No. 75-21 at 3 (CM/ECF page numbers).   GME's photographs of the cannons show that they bear distinctively French markings and that they date to the sixteenth

---

[7] The original letter was written in code, and a decryption of its contents appears (in Spanish) in the margin of the original document.   Delgado Dec., Doc., No. 75-16 ¶ 55; Doc. No. 81-6, at 4-14.   This quotation is a quotation of John de Bry's translation of that decryption.   Doc. No. 81-6, at 2-3.

century.   Leluc Dec., Doc. No. 75-14 ¶¶ 13-15 and pages 16-24 (CM/ECF page numbers).   Sylvie Soria Leluc, the head of the Artillery Department at the Musée de l'Armée in Paris, has opined that the sizes and markings of the cannons are consistent with those listed on the artillery register of *la Trinité*.   *Id.* ¶¶ 11 (noting that casting cannons was very difficult at the time and that it was not unusual for old equipment to remain in service for a long time after the change of monarch or for a ship to be armed with old guns), 17 (comparing the cannons GME found to the cannons listed on *la Trinité*'s artillery register).

In addition to the cannons, GME also found a stone landmark or monument that bears the arms of France.   *Id.* ¶ 18 and page 18 (CM/ECF page number); Doc. No. 75-19, at 8; Doc. No. 75-20, at 35.   The markings on the monument appear to be very similar to those on the territorial marker that Ribault is known to have placed at the River of May in 1562.   Leluc Dec., Doc. No. 75-14 ¶ 20.

*7.     Discussion.*

After reviewing all of the parties' evidence, the Court is left with the following conclusions, which are explained in more detail, below: GME found a shipwreck site on the north side of Cape Canaveral, which is in the vicinity of where the evidence shows that *la Trinité* sank.   That shipwreck site included sixteenth century French cannons that are consistent with the cannons listed on the artillery register of *la Trinité*.   At the same site, GME found a stone monument bearing the coat of arms of the French king.   That monument was similar to another monument the 1562 Ribault fleet planted at the River of May.   A contemporaneous record suggests that *la Trinité* was carrying

multiple such monuments.   Taken together, this evidence establishes that the *res* is more likely than not *la Trinité*.[8]

a. Location.

As explained above, the *res* is located near Cape Canaveral (to its north), which is where the weight of the contemporaneous and secondary sources presented to the Court locate the sinking of *la Trinité*.   Specifically, contemporaneous accounts report that the hurricane blew the Ribault fleet south from St. Augustine.   *See, e.g.*, Doc. No. 81-3, at 91.[9]   A survivor of the shipwreck told Menéndez that three of the ships "had gone to the bottom" "20 or 25 leagues" from the Matanzas Inlet (where the conversation occurred) and that *la Trinité* had been driven into shoals another "five leagues" away —again confirming that *la Trinité* sank significantly south of the Matanzas Inlet. Doc. No. 81-2, at 428.   Most importantly, Menéndez and de Merás (his second-in-command) reported that survivors of the Ribault fleet were found building a fort near Cape Canaveral.   Doc. No. 84-1, at 440; Doc. No. 81-4, at 123, 127.   Those survivors had artillery from "the flag ship of Juan Rivao that had been lost there" that was too heavy to be transported by Menéndez's ships and certainly could not have been transported far from the site of the shipwreck by the survivors.   Doc. No. 84-1, at 440 (Menendez wrote that he "received information from the Indians, that 70 or 80 Frenchmen were collected together, building a fort at Cape Canaveral . . . and that they had much artillery and ammunition that they had taken out of the flag ship of Juan Rivao that *had been lost*

---

[8] The Court notes that one of GME's experts, Dr. Robert H. Baer, devoted a significant portion of his declaration to arguing that the *res* cannot be identified as *la Trinité* because GME has not discovered a primary shipwreck site at all, but rather "shipwreck scatter."   Baer Dec., Doc. No. 79-1 ¶¶ 11-12; Doc. No. 79-2 ¶¶ 14-19. GME does not make this argument in its response brief, thereby waiving it.   The Court notes, moreover, that an argument very similar to Dr. Baer's "shipwreck scatter" argument was rejected in the very similar *Odyssey Marine* case. *See Odyssey Marine Appeal*, 657 F.3d at 1174, 1180-81 & n. 15.

[9] For geographical context, I note that the mouth of the St. John's River (Ribault's River of May) is north of St. Augustine.   Matanzas Inlet lies south of St. Augustine.   Cape Canaveral is south of Matanzas Inlet.   *See, e.g.,* Doc. No. 105-1, at 107-10.

*there*") (emphasis added); Doc. No. 81-4, at 126.   The 1567 account of Bartolome Barrientos also

locates the site of the survivors' fort at Cape Canaveral.   Delgado Dec., Doc. No. 75-16 ¶ 52 and

Ex. 10 thereto (Doc. No. 81-7, at xxi; Doc. No. 81-10, at 70, English Translation of *Pedro Menéndez*

*de Aviles: Founder of Florida* ("[Menéndez] was at Fort St. Augustine when some friendly Indians

came to report that a number of men, similar to those he had slain, were building a fort and a ship

at Cape Canaveral . . . ."); Doc. No. 81-11, at 72 ("November 4, 1565, three days after setting out

from Canaveral the site of the Lutheran fort . . . the Spanish part began to suffer hunger and

fatigue.").   Moreover, one of GME's own experts—Robert F. Marx—explains that he has

"mounted various expeditions in the area north of Cape Canaveral where [the Ribault ships] were

known to be lost . . . ."   Marx Dec., Doc. No. 79-3 ¶ 6.

GME's attempts to counter this evidence are unavailing.   I address each of its arguments,

below.

### i.      *The surviving crewmember account.*

First, GME submits that "[t]he only record as to the location of the sunken ship . . . " comes

from the surviving crew member mentioned above and that the surviving crew member reported

that *la Trinité* sank "five leagues or about 15 miles south of where they were."   Doc. No. 79, at 2.

According to GME, that means that *la Trinité* sank 15 miles south of the Matanzas Inlet, which is

near current-day Dead Lake, Florida—some 90 miles north of Cape Canaveral.   *Id.*   This argument

is problematic on several levels.   Initially, the Court concludes that the crew member's statement

(as reported by Menéndez) does not, as GME claims, state that *la Trinité* sank five leagues from the

Matanzas Inlet.[10]   Read in context, the Court finds that, when Menéndez reported that the crew

_____

[10] For this Dead Lake hypothesis, GME relies not on the actual text of the Menéndez letter, but rather on what
it says are pages 27-29 of the Florida State Historical Society's publication of "Jean Ribault The Whole and True
Discouery of Terra Florida."   Doc. No. 79, at 2; Doc. No. 79-5.   These pages appear to be taken from an introduction

member said that *la Trinité* was "five leagues away from them, anchored in three fathoms, near some shoals," Menéndez was saying that the crew member reported that *la Trinité* was driven onto shoals five leagues from the other ships in the Ribault fleet—which were, as reported by the crew member—"about 20 to 25 leagues" from the Matanzas Inlet, significantly further south than GME posits.  Doc. No. 81-2, at 428.  This would bring the site of *la Trinité*'s demise to approximately 25 to 30 leagues south of Matanzas Inlet.  The Republic of France's expert has credibly opined (without objection from GME) that a "league" was not a standard measure at the time and could be as great as 6.3 kilometers (just less than 4 miles).  Delgado Dec., Doc. No. 75-16, at 16 n. 5. Combining the uncertainty of the meaning of a "league" with the conclusion that the crew member was saying that *la Trinité* was driven onto shoals five leagues away from where the other Ribault fleet ships were lost, the Court concludes that the crew member's report is not inconsistent with the conclusion that *la Trinité* sank near Cape Canaveral.

Moreover, even if the crew member's statement means what GME claims it means (that *la Trinité* was driven onto shoals five leagues south of the Matanzas Inlet), it is not true that there are no other records as to the location of the sunken ship—most importantly, the eye-witness account of Menéndez, who found the survivors of the shipwreck near Cape Canaveral, and the account of Menéndez's second-in-command, de Merás.[11]   If indeed the crew member's account conflicts with those of Menéndez and de Merás, the Court credits those accounts over that of the crew member,

---

to the work, although the Court cannot be certain of this because GME included only a few excerpted pages and did not identify their author or the credentials of that author.  The excerpt does not make it clear why the author interpreted "five leagues from them" to mean five leagues from where the conversation took place (the Matanzas Inlet) rather than the more natural meaning—that the crew member was saying that *la Trinité* was driven onto shoals five leagues from where the other Ribault fleet ships sank (which was "20 to 25 leagues from here"—i.e. 20 to 25 leagues from the Matanzas Inlet).  For these reasons, the Court gives no weight to the conclusions in the Florida State Historical Society's publication cited by GME.

[11] It is not clear from the excerpts provided whether de Merás was present with Menéndez when Menéndez came upon the French survivors at Cape Canaveral.

giving particular weight to Menéndez's account.   Menéndez actually visited the site where the Ribault shipwreck survivors were constructing a fort and saw the artillery that the survivors brought ashore from the shipwreck.   Some of the artillery was too heavy for Menéndez's ships to transport, and evidence supports the conclusion that the survivors could not have transported it from Dead Lake to Cape Canaveral.   Accordingly, the Menéndez account supports a finding that *la Trinité* wrecked near the survivor camp Menéndez found at Cape Canaveral.

ii.   *Fairbanks treatise.*

Second, GME notes that, in an 1881 book called *History and Antiquities of St. Augustine, Florida*, George R. Fairbanks, M.A., opined (in a footnote) that the *la Trinité* wrecked "north of 'Mosquito Inlet', also known as Ponce Inlet, just south of Daytona Beach, Florida" because "'Canaveral, where Ribault wrecked, must have been some point north of Mosquito Inlet, and <u>not</u> the cape now bearing that name (emphasis added), as he could not have crossed Mosquito Inlet on his march to Matanzas.'"   Doc. No. 79, at 2-3 (quoting Doc. No. 79-6, at 33 n. 9).   The Court does not credit this opinion because it offers no explanation as to how the author concluded that Ribault could not have used an inland route to bypass the Mosquito Inlet (now known as the Ponce Inlet) when he marched from the site of the shipwreck to the Matanzas Inlet.   *See* Doc. No. 84-1, Declaration of James A. Goold and Exs. 5 and 6 thereto.   Notably, GME's own expert—Robert F. Marx—posits that the *res* could be a 1572 shipwreck that occurred "near Cape Canaveral," after which the "survivors built a small fort" and "eventually walked to St. Augustine."   Doc. No. 79-3, at 11 (CM/ECF page numbers).   This suggests that—contrary to the speculation of the Fairbanks excerpt—it was possible for Ribault to have either crossed or bypassed the Mosquito Inlet in the course of a walking journey from Cape Canaveral to the north.

###### iii.     *Armstrong treatise.*

Third, GME cites to a treatise by Douglas R. Armstrong titled *French Castaways at Old Cape Canaveral*.   GME states that Armstrong discovered mid-sixteenth century European artifacts onshore just south of present-day Turtle Mound, Florida, approximately 30 miles north of the *res,* and that subsequent archaeological efforts in the early 1990s disclosed numerous additional artifacts from that time period.   Then, GME states, "it is surmised that this is the temporary fort built by the survivors of the *Trinite*. . . . Clearly, if it is the site of the temporary fort, it is illogical to assume that the survivors would have cannibalized the ship and carted its remains, including heavy brass cannon, up the beach some thirty miles to build their fort."   Doc. No. 79, at 3.

The Armstrong treatise does, in fact, surmise that the fort built by survivors of the wreck of *la Trinité* was "located more closely to Turtle Mound than farther south near the Cape tip."   Doc. No. 105-1, at 43.   However, as the Republic of France points out in its reply, the Armstrong treatise also states that "[a]ll of the French vessels, including the *Trinité*, were soon wrecked on the beaches along a fifty-mile stretch, beginning near today's Ormond Beach and ending at Cape Canaveral." Armstrong further writes that "[t]he *Trinité* ended up at the Cape[,]" and that Ribault told Menéndez that *la Trinité* "had gone ashore near Canaveral."   Doc. No. 84-1, at 25, 26 (CM/ECF page numbers).   Thus, to the extent that the Armstrong treatise posits Turtle Mound as the location for the survivors' fort—and, thus, the shipwreck itself—it is internally inconsistent and entitled to little weight.

Moreover, a review of the excerpts of the Armstrong treatise filed by GME makes it clear that Armstrong's Turtle Mound prediction is far from definitive.   Instead, Armstrong attempts to estimate the location of the survivors' fort by translating Menéndez's accounts of his movements into modern-day distances.   That attempt requires him to make a number of assumptions—

specifically, that a Spanish league equaled 3.25 miles, that Menéndez's troops could march one to one-and-a-half miles per hour, and that Menéndez's troops marched only about one mile per hour when they traveled from St. Augustine to the survivors' fort.   Doc. No. 105-1, at 42-43.   GME did not file enough of the Armstrong treatise for the Court to adequately evaluate Armstrong's conclusion that a Spanish league equaled 3.25 miles, but portions of the excerpt that was filed undermine that conclusion.   *See* Doc. No. 105-1, at 42 (noting that Menéndez's foot patrol covered "a known distance of nearly fifteen miles, which was said to be about four leagues," which would mean that a league was equivalent to 3.75 miles).

And even if the 3.25-miles-per-league assumption is correct, the variability in Armstrong's estimates of the speed of Menéndez's troops results in a wide possible range for the location of the *Trinité* survivor fort.   As Armstrong explains:

> [I]f the average speed remained between one, and one-and-a-half miles per hour, the total distance traveled [by Menéndez's troops when marching from St. Augustine to the survivors' fort] would have been somewhere between seventy two and one hundred eight miles . . . . The ninety-mile mean terminus point is situated midway between modern-day Eddy Point and Gallinipper Point, within the area of North Playa Linda Beach.   The entire thirty-six-mile target area, however, is bracketed to its north by Turtle Mound and *at the south by the outermost tip of Cape Canaveral*.

*Id.* at 43 (emphasis added).   While Armstrong assumes that the survivors' fort was located at the northern end of that range because of the difficulty of the march (and, thus, close to the French artifacts found near Turtle Mound at the Armstrong Site), his model allows for the fort to have been located as far south as Cape Canaveral, which is consistent with the location of the *res* in this case. Armstrong assumes that the *Trinité* survivor fort was located close to the artifacts he found near Turtle Mound mainly because he assumes that marching conditions would have caused Menéndez's troops to move only at a one-mile-per-hour pace—not because anything definitive links the artifacts to the *Trinité* survivor fort in particular.   *Id.*   Armstrong also does not explain why Menéndez and

de Merás would have described the location of the fort of the *Trinité* survivors as being at Cape Canaveral if it was, in fact, located some 15-20 miles north of the Cape.   In sum, then, the Armstrong treatise is not sufficient to undermine the conclusion that *la Trinité* sank near Cape Canaveral.

*iv.*      *Meide and de Bry journal article.*

Finally, GME notes that, in 2014, Chuck Meide and John de Bry published a paper in which they "clearly assert that the location of the wreck of the *Trinite*, based upon historical records and the Armstrong fort site is midway between Ponce Inlet, Florida, and Cape Canaveral."   Doc. No. 79, at 3.   Thus, GME notes, "[t]hese historians and archaeologists place the wreck of the *Trinite* some 30 to 40 miles from the site of the *res* in this case."   *Id.*   But, upon review of the entire document, the Meide and de Bry paper does not "clearly assert" that the wreck of *la Trinité* is "midway between Ponce Inlet, Florida, and Cape Canaveral."   Rather, the article states: "Three of the ships [of the Ribault fleet] were lost in the vicinity of Ponce Inlet, broken to pieces in the surf, while the flagship *La Trinité* was stranded intact on a sandbar 5 to 10 leagues further south, towards Cape Canaveral (Lyon 1976:124)."   Doc. No. 79-7, at 80.   Absent any evidence as to the relative distances between Ponce Inlet and Cape Canaveral (which GME has not provided), the Court cannot conclude that Meide and de Bry have placed the wreck "some 30 to 40 miles" from the site of the *res* in this case.   On its face, the statement appears to suggest that *la Trinité* wrecked near Cape Canaveral.   Moreover, the only basis for this statement is a citation to a 1976 book by Eugene Lyon. *Id.* at 80, 90 (providing citation to Lyon book).   Without reviewing the Lyon book and the rationale for the assertion that *la Trinité* was stranded on a sandbar 5 to 10 leagues south of the Ponce Inlet,

the Court cannot credit this statement.   Accordingly, the Meide and de Bry article does not undermine the conclusion that *la Trinité* sank near Cape Canaveral.[12]

Ultimately, GME has not come forward with credible evidence undermining the evidence submitted by the Republic of France, which establishes by a preponderance of the evidence that *la Trinité* sank near Cape Canaveral, which is where the *res* is located.

b.   Stone Monument.

Next, there is also some evidence that *la Trinité* was carrying a stone monument like that discovered by GME.   Specifically, in January 1566—just a few months after *la Trinité* sank—the Spanish ambassador to France reported as follows: "Of the captain who went from Bordeaux in the small ship of which I have written your majesty, to Florida, it is also understood here that a Spanish ship sent it to the bottom and they felt this keenly because it carried six marble columns with the arms of this king and many epitaphs to put them in the fort of la Florida."   Doc. No. 75-16, ¶ 55 and Ex. 9 thereto, Doc. No. 81-6.

It is, of course, true—as GME argues—that Ribault sailed from Dieppe (not Bordeaux) and that *la Trinité* sank following a storm (and was not "sent to the bottom" by a Spanish ship).   GME

---

[12] GME does not make this argument, but the Court notes that, elsewhere, the article does propose a survey area that is located "midway between Cape Canaveral and Ponce Inlets."   Doc. No. 79-7, at 87 (caption to Figure 4). The article explains that this area was selected because it is "directly offshore the location of the terrestrial archaeological sites associated with the 1565 shipwreck survivors."   *Id.*   But the remainder of the article makes it clear that several of the Ribault ships wrecked in the area between the Ponce Inlet and Cape Canaveral.   *Id.* at 80.   It also explains that approximately 20 of the survivors Menéndez encountered at Cape Canaveral "took their chances with the Surruque Indians rather than risk Spanish mercy" and "disappeared into the wilderness and into history, though traces of their activities have persisted in the archaeological record."   *Id.* at 81.   As such, there were multiple groups of survivors that could have been responsible for survivor camps mentioned in the article.   The article makes no claim that any particular site was associated with any particular shipwreck—let alone that any of the sites are definitively associated with *la Trinité* or represent the site of the temporary fort that Menéndez encountered.   *Id.* at 80.   The article proposes a method for locating the Ribault fleet ships generally—not *la Trinité* in particular.   *Id.* at 87 (emphasis added) ("The most important clue to the location of the *wrecks* are the survivor camps.").   Accordingly, this reference to "midway between Cape Canaveral and Ponce Inlets" does not undermine Menéndez's report that he encountered the survivors of the wreck of the *la Trinité* with their temporary fort and heavy artillery near Cape Canaveral or the conclusion that *la Trinité* wrecked near Cape Canaveral.

has not, however, come forward with any evidence suggesting that the French king dispatched some other captain to put stone monuments "in the fort of la Florida" in the same time frame as the 1565 Ribault fleet or that another ship sent to Florida on a French royal mission was lost around the same time as *la Trinité*.   In short, GME has not presented any evidence that the Spanish ambassador could have been speaking of anyone other than Ribault or any ship other than *la Trinité*.   Given the difficulties of transatlantic communication in the sixteenth century, it is not surprising that the Spanish ambassador would have information that was not completely correct.   The Spanish ambassador was writing just a few months after *la Trinité* sank, and the evidence establishes that Ribault had been sent on a mission by the French king to Florida.   Accordingly, and in the absence of contradictory evidence from GME, the Court concludes that it is more likely than not that the Spanish ambassador was speaking about Ribault and *la Trinité* and, thus, that *la Trinité* was carrying stone monuments bearing the arms of the French king.

As explained above, the stone monument at the shipwreck site is very similar to the monument that Ribault placed at the River of May in 1562.   Thus, it is more likely than not that the stone monument found at the shipwreck site is a French territorial marker.   Its presence at the shipwreck site supports the conclusion that the *res* is *la Trinité*.

GME does not dispute that the stone monument is French or even that it is a territorial marker like those placed by the 1562 Ribault fleet.   Instead, it offers a number of arguments intended to undermine the obvious conclusion—that the *res* is *la Trinité*.

First, it argues that the *res* cannot be *la Trinité* because the stone monument was not included on the ship's "manifest."   Doc. No. 79, at 4.   The document to which GME refers is the Register of Artillery.   It is not a generalized manifest of everything on board *la Trinité*, but instead a register

of artillery, munitions, and related supplies.[13]   Accordingly, the absence of the stone monument from the register does not undermine the conclusion that, as reported by the Spanish ambassador, *la Trinité* was carrying a monument similar to that discovered at the shipwreck site.

In a similar vein, GME contends that the *res* cannot be *la Trinité* because a report from a Spanish spy in the French court does not mention that *la Trinité* was carrying any monuments.   Doc. No. 79, at 4.   The report of Gabriel de Enveja does not, however, purport to include an exhaustive inventory of the contents of *la Trinité*.   *See* Doc. No. 81-1, at 3-4 (CM/ECF page numbers) (answering, in response to the question, "What munitions and victuals do they carry?": "The munitions they carry are very great, because they tell me that they carry a lot of gunpowder and shot, 200 reinforced cannons which go unmounted to put in the said fort which they have made

---

[13] GME and its experts repeatedly refer to this document as a "manifest." *See, e.g.*, Declaration of Robert H. Baer ("Baer Dec."), Doc. No. 79-2 ¶ 18, ("As to the assertion that six stone (marble monuments) were on board the La Trinite in the Ribault fleet as stated above the ship's manifest does not list any monuments."); Declaration of Robert F. Marx ("Marx Dec."), Doc. No. 79-3 ¶ 10, ("I have spent a significant amount of time studying the manifest of the Trinite . . . .  There is no stone monument listed on the manifest of the Trinite . . . .   A ships manifest is very detailed and generally lists every major piece of cargo even mundane objects such as tools, cannonballs and even needle and thread, there is no chance that an object of such importance and size would have been left off of such a detailed and important document.")   They argue that it is a manifest because it includes "mundane objects" such as sewing needles and thread. *See, e.g.*, Marx Dec., Doc. No. 79-3 ¶ 10.   However, when the registers for the ships in the Ribault fleet are read in their entirety, it is clear that these "mundane objects" are listed because they are associated with the making of munitions. *See, e.g.*, Doc. No. 81-22, at 4-5 (CM/ECF page numbers) (listing sewing thread and needles under the category "Cannonballs," but also listing "Canvas to make cartridges," which—as the Republic of France points out in its reply, Doc. No. 84, at 4—presumably would require needle and thread); *id.* at 8-9 (CM/ECF page numbers).   GME's response brief also suggests that the document includes "measures of myrrh" as another "mundane item."   Doc. No. 79, at 4 (citing the journal article in the record as Doc. Nos. 79-7 and 79-8).   It bases this assertion on a table appearing in a journal article authored by Chuck Meide and John de Bry.   The Republic of France has, however, submitted a declaration from John de Bry (one of the authors of the journal article), who convincingly establishes (via citation to the *Grand Dictionnaire Universel*) that "measures of myrrh" is an incorrect translation of the original "coin de mires" and that the proper translation is "aiming wedges for cannons"—which one would expect to find on a registry of weapons, munitions, and related supplies.   Declaration of John de Bry ("De Bry Dec."), Doc. No. 84-2 ¶¶ 3-5 and Ex. 2 thereto.   Accordingly, the Court concludes that this document it is what it purports to be—a register of artillery and munitions.   *See also* De Bry Dec., Doc. No. 84-2 ¶ 5 (opining that the register consists of weapons, munitions, and "utensils dependent of the said artillery" and "not other cargo").

there.  They carry many hatchets, hammers and dies—victuals for land and victuals for sea, for coming and going, for land, provisions for one year."). Therefore, Enveja's failure to mention a stone monument does not support a conclusion that no stone monuments were aboard *la Trinité*.

Next, GME argues that the stone monument located at the shipwreck site is not a monument carried by *la Trinité*, but rather the monument that Ribault placed at the River of May in 1562: "Ribault . . . placed two monuments in 1562, one of which has never been located.  It is entirely possible that another Spanish captain acting under the same order as Rojas, located the other monument, loaded it onto his ship, and subsequently wrecked at Cape Canaveral without any documentation of it."  Doc. No. 79, at 5-6.  GME and its experts offer no evidence[14] to support this rank speculation.  France has submitted evidence suggesting that *la Trinité* was carrying stone territorial markers.  Based on the persuasive evidence, the Court determines that it is more likely than not that the stone monument found at the shipwreck site is there because it was carried by *la Trinité*.

---

[14] GME's expert, Robert F. Marx, does opine that the monument discovered by GME "is identical to the monument depicted in the Debry/Le Moyne painting which was seen on land in 1565. It is evident to me that this is the same monument.  There is no way the monument could have been loaded aboard the Trinite in 1565."  Marx Dec., Doc. No. 79-3 ¶ 10(b).  This opinion is not persuasive because Marx does not explain how he concluded—on the basis of a picture of a portion of the monument found at the shipwreck site—that the monument discovered by GME is the monument that Ribault planted at the River of May in 1562, as opposed to a similar monument. Others of Marx's arguments are similarly not persuasive because they are based on pure speculation.  *See, e.g., Marx* Dec., Doc. No. 79-3, at 9-14 (CM/ECF page numbers) (listing other shipwrecks that occurred near Cape Canaveral and speculating, without supporting evidence, that any one of them could be the source of the French cannons and French territorial marker discovered by GME).  Finally, Marx opines that "positively identifying a shipwreck [on the basis of artifacts found at the shipwreck site] is extremely difficult if not impossible" because sometimes the artifacts found in a shipwreck are older than the shipwreck itself.  Marx Dec., Doc. No. 79-3 ¶¶ 7-8.  While Marx's argument might be reasonable in the abstract, it is not persuasive in this case, where France relies on more than just the age of the artifacts discovered to establish that the *res* is *la Trinité*.  In a similar vein, Marx also argues that the *res* could not even be positively be identified as belonging to the Ribault fleet if the ship's bell were found because it is possible that an enemy ship could have seized the bell and then sunk with it on board.  *Id.* ¶ 9.  Such an argument is not persuasive because it is based on speculation and ignores the standard of proof—the preponderance of the evidence.

c.      Cannons.

Finally, the Court concludes that the cannons GME located at the site also support the conclusion that the *res* is *la Trinité*.   As explained above, GME found three bronze cannons at the shipwreck site.   Sylvie Soria Leluc, the head of the Artillery Department at the Musée de l'Armée in Paris, has opined that the markings on the cannons identify them as sixteenth century French culverins.   Leluc Dec., Doc. No. 75-14 ¶¶ 14-15.   GME does not dispute that opinion.   *See, e.g.* Baer Dec., Doc. No. 79-2 ¶ 15 ("The provenance (origin) of the three bronze cannon . . . are clearly French.").   Leluc has also opined that cannons discovered by GME correspond in size to the culverins listed on the registers of artillery for *la Trinité*.   Leluc Dec., Doc. No. 75-14 ¶ 17.   Again, GME submits no evidence to undermine that conclusion.[15]

Instead, GME offers more speculation.   Specifically, it argues, "The fact that the cannon were of French origin, however, does not prove they were on a French ship, when they were lost. It is just as probable that the cannon were captured by the Spanish and placed aboard one of its ships, along with the monument, and that ship sank at Cape Canaveral."   Doc. No. 79, at 6.   The

---

[15] In a confusing portion of his affidavit, GME's expert Dr. Robert H. Baer states that "there are problems with the purported manifest of the La Trinite that are exhibits in this court litigation."   Baer Dec., Doc. No. 79-1 ¶ 13 and 79-2 ¶ 13 (continued).   It appears that the "problem" is that the registers of artillery do not identify the ship's cargo and armaments with "identifying numbers or symbols."   And, it appears that GME is suggesting (based on a conversation with "Dr. Eugene Lyon"—which is not in the record, but appears to have related to the manifests of two shipwrecks from 1622, the Atocha and the Santa Margarita) that there might be another, separate cannon manifest that would include identifying numbers or symbols.   Accordingly, Dr. Baer opines that he "can-not confirm that the two above cited bronze cannon are associated with La Trinite or any other vessel at this time."   *Id.*   It is unclear to the Court why the fact that manifests of two (possibly Spanish) ships from 1622 included identification numbers for the bronze cannons listed on those manifests would suggest that the register of artillery for a 1565 French ship (*la Trinité*) should also include such identification numbers, and GME has not explained this point.   Moreover, the fact that there might be another, as yet undiscovered, but more complete manifest for *la Trinité* does not change the fact that the cannons GME discovered correspond to the cannons listed on the register of artillery for *la Trinité*.   And it does not change the fact that such correspondence suggests that the *res* is *la Trinité*.   The Republic of France need only prove that the *res* is *la Trinité* by a preponderance of the evidence—not beyond a reasonable doubt.   Accordingly, the Court rejects Dr. Baer's suggestion that the *res* cannot be identified in the absence of a register that includes identifying numbers or symbols for the cannons.

Court rejects this argument for the same reasons it rejected GME's speculative arguments about the stone monument.

        8.     *Finding*.

Based on the above evidence, the Court concludes that the *res* is *la Trinité*. The *res* is located near Cape Canaveral, which is where *la Trinité* is known to have sunk. The shipwreck site includes cannons that correspond to the artillery register of *la Trinité*. And *la Trinité* was known to be carrying a stone monument similar to the monument found at the shipwreck site. Taken together, these facts establish by a preponderance of the evidence that the *res* is *la Trinité*. *See also* Delgado Dec., Doc. No. 75-16 ¶ 56-58 (opining that the *res* is *la Trinité*). GME has not come forward with sufficient evidence to undermine this conclusion. Instead, GME and its experts rely for the most part on speculation: Maybe some unnamed non-French ship somehow gained control of cannons like those on *la Trinité* and a territorial monument like that on *la Trinité* and then happened to sink in the exact place that *la Trinité* is known to have sunk—all without leaving any documentary evidence that can be presented to the Court. Such arguments, "which simply advance metaphysical doubt," "propos[e] explanations other than the obvious," and suggest pure happenstance as the "more reasonable hypothesis" are not persuasive. *See Odyssey Marine District Court*, 675 F. Supp. 2d at 1134, 1135 (quotation omitted).

Because the Court has concluded that the *res* is *la Trinité* and it is undisputed that *la Trinité* is the sovereign property of the Republic of France, the Court lacks subject matter jurisdiction over the *res.* Therefore, the Republic of France's motion to dismiss for lack of subject matter jurisdiction is due to be granted.

**III.     STATE OF FLORIDA'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND *DAUBERT* MOTION.**

Throughout this litigation, the State of Florida has supported the Republic of France's claim to the *res* and has postured its claim to the *res* as subordinate to the Republic of France's claim. Doc. No. 35.   Thus, because the Court has concluded that the *res* is a sovereign ship of the Republic of France and that the Court lacks subject matter jurisdiction over the *res*, the State of Florida's claim to the *res* (and its *Daubert* and partial summary judgment motions) becomes moot. Moreover, even if the State of Florida's claim and the motions were not moot, the Court would lack subject matter jurisdiction to rule on them.   Accordingly, the Court will dismiss the State of Florida's claim to the *res* (Doc. No. 35) for lack of subject matter jurisdiction and direct the Clerk of Court to terminate the State of Florida's *Daubert* (Doc. No. 96) and partial summary judgment (Doc. No. 97) motions.

**IV.     CONCLUSION.**

For the reasons stated above, the Court **ORDERS** as follows:

1.     The Republic of France's Motion to Dismiss (Doc. No. 75) is **GRANTED**.

2.     GME's complaint (Doc. No. 1) is **DISMISSED** for lack of subject matter jurisdiction.

3.     The warrant of arrest (Doc. No. 13) is **VACATED**.

4.     The Republic of France's claim (Doc. No. 26) and the State of Florida's alternative claim to the *res* (Doc. No. 35) are **DISMISSED** for lack of subject matter jurisdiction.

5.     The substitute custodian (the State of Florida) is **ORDERED** to return the *res* to the Republic of France within fourteen days from the date of this Order under such circumstances and in such a manner as agreed to by the Republic of France and the

State of Florida, unless the Republic of France agrees in writing that the State of Florida may retain the artifacts under conditions specified in the agreement.

6.      My previous Order prohibiting recovery activity on the *res* (Doc. No. 46) is modified and it is **ORDERED** that the Republic of France and those acting on its behalf may begin recovery of the *res*.

7.      The **Clerk of Court** is **DIRECTED** to **TERMINATE** all pending motions (including the State of Florida's *Daubert* motion (Doc. No. 96) and its partial summary judgment motion (Doc. No. 97) and, thereafter, to close the case.

**DONE** and **ORDERED** in Orlando, Florida on June 29, 2018.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE